

# In The
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

_____

## No. 06-09-00006-CR

_____


DARNELL HARTSFIELD, Appellant

V.

THE STATE OF TEXAS, Appellee


On Appeal from the 4th Judicial District Court
Rusk County, Texas
Trial Court No. CR05-333


Before Morriss, C.J., Carter and Moseley, JJ.
Opinion by Justice Carter

OPINION

The murder of five persons at the Kentucky Fried Chicken (KFC) restaurant in Kilgore, Texas, remained an unsolved mystery for more than twenty years. After the advent of DNA technology, Darnell Hartsfield was linked to the crime scene by deposits of his blood on a box. *See Hartsfield v. State*, 200 S.W.3d 813, 816 (Tex. App.—Texarkana 2006, pet. ref'd). A Brazos County[1] jury found Hartsfield guilty of capital murder. The death penalty had been waived; Hartsfield was sentenced to life imprisonment. He appeals,[2] raising two issues: (1) the evidence was not legally or factually sufficient to support his conviction; and (2) the trial court erred in admitting evidence of an extraneous offense. We affirm the judgment of the trial court. This appeal involves the death of Opie Hughes.

I.      **Factual Summary**

Between 9:00 and 10:00 p.m. on September 23, 1983, Star Spagano was waiting in line to order at the Kentucky Fried Chicken in Kilgore, Texas. Star and the two young men behind her in

[1]Due to the pretrial publicity involved with this case, the trial court granted the State's motion to transfer venue, and this case, as well as the companion cases referred to in footnote two, were transferred to the 361st Judicial District Court of Brazos County. *See* TEX. CODE CRIM. PROC. ANN. art. 31.02 (Vernon 2006). Pursuant to Article 31.08, the appeal was filed with this Court. TEX. CODE CRIM. PROC. ANN. art. 31.08, §§ 1, 3 (Vernon Supp. 2009).

[2]Hartsfield appeals this and four other convictions in which he raises identical issues, all decided this date. In cause number 06-09-00007-CR, he appeals his conviction for the murder of David Maxwell; in cause number 06-09-00008-CR, he appeals his conviction for the murder of Mary Tyler; in cause number 06-09-00009-CR, he appeals his conviction for the murder of Montgomery Landers; and in cause number 06-09-00010-CR, he appeals his conviction for the murder of Joseph Johnson.

2

line were close enough to the front counter to overhear the telephone conversation between KFC employee Kim Tyler and her mother, KFC manager Mary Tyler, wherein Kim told Mary that the afternoon deposit had not been made and that there was $2,000.00 in the register. Spagano identified Hartsfield as the man immediately behind her in line at the KFC.

After the KFC closed for the night, several persons entered the restaurant, and a struggle ensued, resulting in a large dent in the wall and significant amounts of Mary's blood on the floor and in the KFC office. The perpetrators took the money from the registers as well as the bank deposit bags. Three of the five victims, Opie Hughes, Mary Tyler, and Joey Johnson, were employees working at the time. David Maxwell was at the restaurant to give Johnson a ride home, and Monty Landers accompanied Maxwell. When Mary did not return home at the usual time, her worried husband drove to the KFC and found no one there and the cash registers open and emptied. The next morning, the bodies of the victims were found in an oil field in Rusk County. Each had been shot several times and was dead.

## II. The Evidence Was Legally and Factually Sufficient to Convict Hartsfield of Capital Murder

In Hartsfield's first and second points of error, he contends that the evidence supporting his conviction was legally and factually insufficient. We disagree.

### A. Standard of Review

When reviewing the legal sufficiency of the evidence, an appellate court must ask "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact

3

could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *Laster v. State*, 275 S.W.3d 512 (Tex. Crim. App. 2009); *Roberts v. State*, 273 S.W.3d 322 (Tex. Crim. App. 2008); *Johnson v. State*, 23 S.W.3d 1, 7 (Tex. Crim. App. 2000). This standard mandates that the reviewing court accord deference to the fact-finder's duty to resolve conflicts in testimony and other evidence. *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007). In our review, we must evaluate all of the evidence in the record, both properly and improperly admitted, both direct and circumstantial, to determine whether the cumulative force of all the evidence (direct, circumstantial, or both) supports the verdict when such evidence is viewed in the light most favorable to that verdict. *Id*.; *see also Williams v. State*, 235 S.W.3d 742, 750 (Tex. Crim. App. 2007); *Dewberry v. State*, 4 S.W.3d 735, 740 (Tex. Crim. App. 1999).

"Evidence may be factually insufficient if: '1) it is so weak as to be clearly wrong and manifestly unjust or 2) the adverse finding is against the great weight and preponderance of the available evidence.'" *Berry v. State*, 233 S.W.3d 847, 854 (Tex. Crim. App. 2007) (quoting *Johnson*, 23 S.W.3d at 11). Under this standard, we must afford "due deference" to the fact-finder's determinations. *Marshall v. State*, 210 S.W.3d 618, 625 (Tex. Crim. App. 2006); *see Young v. State*, 242 S.W.3d 192, 198 (Tex. App.—Tyler 2007, no pet.). And although when we review the factual sufficiency of the evidence, we have the ability to second-guess the fact-finder to a limited degree, we should nonetheless be deferential, with a high level of skepticism about the fact-finder's verdict

4

required before a reversal can occur. *Roberts v. State*, 220 S.W.3d 521, 524 (Tex. Crim. App. 2007); *Young*, 242 S.W.3d at 198–99. We use a hypothetically correct jury charge to evaluate both the legal and factual sufficiency of evidence. *Grotti v. State*, 273 S.W.3d 273 (Tex. Crim. App. 2008).

The standard of factual review to be applied on appeal is the same regardless of whether the State uses direct or circumstantial evidence. *King v. State*, 895 S.W.2d 701, 703 (Tex. Crim. App. 1995); *McGoldrick v. State*, 682 S.W.2d 573, 577 (Tex. Crim. App. 1985).

### B.    Circumstantial Evidence

In reviewing the sufficiency of the evidence, we should look at "events occurring before, during and after the commission of the offense, and may rely on actions of the defendant which show an understanding and common design to do the prohibited act." *Cordova v. State*, 698 S.W.2d 107, 111 (Tex. Crim. App. 1985). Each fact need not point directly and independently to the guilt of the appellant, as long as the cumulative force of all the incriminating circumstances is sufficient to support the conviction. *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007); *see Johnson v. State*, 871 S.W.2d 183, 186 (Tex. Crim. App. 1993) ("[I]t is not necessary that every fact point directly and independently to the defendant's guilt; it is enough if the conclusion is warranted by the combined and cumulative force of all the incriminating circumstances."); *Barnes v. State*, 876 S.W.2d 316, 321 (Tex. Crim. App. 1994); *Alexander v. State*, 740 S.W.2d 749, 758 (Tex. Crim. App. 1987); *Earls v. State*, 707 S.W.2d 82, 85 (Tex. Crim. App. 1986) (a person's identity can be proved by circumstantial evidence). "Circumstantial evidence is as probative as direct evidence in

establishing the guilt of an actor, and circumstantial evidence alone can be sufficient to establish guilt." *Hooper*, 214 S.W.3d at 13; *see also Guevara v. State*, 152 S.W.3d 45, 49 (Tex. Crim. App. 2004).

**C.      Legal Requirements of Capital Murder Including the Law of Parties**

A person commits capital murder if he or she intentionally or knowingly causes the death of an individual while in the course of committing or attempting to commit robbery. TEX. PENAL CODE ANN. § 19.02(b)(1) (Vernon 2003), § 19.03(a)(2) (Vernon Supp. 2009); *Johnson v. State*, 853 S.W.2d 527, 535 (Tex. Crim. App. 1992); *Frank v. State*, 183 S.W.3d 63, 72 (Tex. App.—Fort Worth 2005, pet. ref'd). The law of parties applies to the offense of capital murder. *Johnson*, 853 S.W.2d at 534; *Frank*, 183 S.W.3d at 72.

Under the law of parties, "[a] person is criminally responsible as a party to an offense if the offense is committed by his own conduct, by the conduct of another for which he is criminally responsible, or by both." TEX. PENAL CODE ANN. § 7.01(a) (Vernon 2003); *Frank*, 183 S.W.3d at 72. A person is "criminally responsible" for an offense committed by the conduct of another, if acting with intent to promote or assist the commission of the offense, he or she solicits, encourages, directs, aids, or attempts to aid the other person to commit the offense. TEX. PENAL CODE ANN. § 7.02(a)(2) (Vernon 2003); *Frank*, 183 S.W.3d at 72. Evidence is sufficient to convict under the law of parties when the defendant is physically present at the commission of the offense and encourages its commission by words or other agreement. *Ransom v. State*, 920 S.W.2d 288, 302

6

(Tex. Crim. App. 1994) (op. on reh'g); *Frank*, 183 S.W.3d at 72–73. In determining whether a defendant participated in an offense as a party, the fact-finder may examine the events occurring before, during, and after the commission of the offense and may rely on actions of the defendant that show an understanding and common design to commit the offense. *Ransom*, 920 S.W.2d at 302; *Cordova*, 698 S.W.2d at 111; *Frank*, 183 S.W.3d at 73.

Further, Section 7.02(b) of the Texas Penal Code provides that

[i]f, in the attempt to carry out a conspiracy to commit one felony, another felony is committed by one of the conspirators, all conspirators are guilty of the felony actually committed, though having no intent to commit it, if the offense was committed in furtherance of the unlawful purpose and was one that should have been anticipated as a result of the carrying out of the conspiracy.

TEX. PENAL CODE ANN. § 7.02(b) (Vernon 2003); *Frank*, 183 S.W.3d at 73.

### D. Primary Points of Contention

The primary points of contention are Spagano's identification of Hartsfield, the box with Hartsfield's blood on it, Hartsfield's connection to a white van on the premises, and the totality of the physical evidence linking Hartsfield to the crime.

#### 1. Spagano's identification of Hartsfield

While Spagano and her boyfriend waited in line at the KFC (he was in front of her in line), she was a mere foot or two away from the two young African-American men immediately behind her. She testified that she "actually turned around and looked at him" and that she "was sure" that the photograph she picked out (Hartsfield) was the man standing immediately behind her in line.

7

Ranger Glenn Elliott's notes describe her identification as "[s]he is sure." At trial, she testified that she could not positively say that the man in the photograph was the man she saw in the KFC. Due to the events occurring more than twenty years prior, she would not even attempt to identify Hartsfield as the man behind her in line at the KFC.

Hartsfield made four arguments that Spagano's identification of Hartsfield is not reliable: 1) Hartsfield was not in the restaurant when the telephone call occurred; 2) Hartsfield was not in the restaurant at all that night because Spagano's order appears last on the register tape; 3) as of twenty minutes before closing, Lanetta Ashley, a KFC employee working that night, did not remember any black men being in the restaurant; and 4) Spagano testified that the man immediately behind her was taller than his companion, and that is fatally contradicted by the fact that Hartsfield is shorter than his co-defendant, Romeo Pinkerton.

Hartsfield first argues that he could not have heard the telephone conversation about the amount of money in the registers because Spagano said the black men did not come into the KFC until she was awaiting her order and that the telephone call was made before she ordered. Specifically, he argues that Spagano testified that the call occurred while she was in line but that the men did not come in until she was waiting for her order. However, Spagano actually testified that at the time she overheard the telephone call, the two young black men had already arrived and were standing right behind her and that based on their proximity to her, she believed they also overheard the telephone conversation.

Hartsfield then argues that Spagano's order appears on the register tape as the last order of the night; therefore, her testimony that Hartsfield ordered food after her cannot possibly be true. Spagano testified that her boyfriend ordered, she ordered, then Hartsfield. She and her boyfriend ate their food inside the KFC and then left at about closing time. The register tape shows the last two orders of the night at 9:47, a nine-piece full dinner, and at 9:57, a "two-piece snack, all white." Spagano ordered two pieces of chicken, potatoes, and coleslaw. The State argued that her order is not the same thing as a "two-piece snack, all white." While this was an issue for the jury's determination, the contrary argument is that for Spagano to have been the last person to order that night, her boyfriend had to have ordered a nine-piece full dinner for himself. The jury could have reasonably concluded that one person did not order a nine-piece full dinner and that Spagano's order was not the last order for the night.

Hartsfield also contends that he was not in the KFC on the night of the murders and that Ashley,[3] a teenage girl working at the KFC on the night of the murders, testified that she did not remember seeing any young black men in the KFC that night, "but I'm not going to say there wasn't." On redirect, Ashley agreed that black men being in the KFC was no "big deal." At most, this testimony created a factual issue for the jury to resolve.

---

[3]Ashley and Kim Tyler left the KFC before the robbery.

Hartsfield also asserted that Spagano's testimony cannot be believed because Spagano identified Hartsfield as being taller than his companion, but Hartsfield's co-defendant, Pinkerton,[4] is taller than Hartsfield. However, the record reflects that blood at the scene matched Hartsfield's (the box) and Pinkerton's (a napkin), but that semen found on one of the victim's pants did not match either of the defendant's.[5] Therefore, the jury could have believed that a third unidentified perpetrator, as opposed to Pinkerton, was in line with Hartsfield at the KFC or that Spagano was simply mistaken about the relative heights of the men.

### 2. The bloody box

During the robbery of the KFC, the perpetrators rummaged through the shelves beneath the main cash register, leaving them messy and disorganized. A box that once held rolls of register tape was found in the KFC with Hartsfield's blood on it.[6] Similarly, one of the shelves beneath the register had a dark stain on it.[7] Neither Ashley nor Leann Killingsworth[8] remember the stain being

---

[4]Pinkerton is Hartsfield's first cousin and they were "running buddies." In their briefs, both Hartsfield and the State refer to Pinkerton as a co-defendant of Hartsfield. According to the record, Pinkerton entered a negotiated plea agreement and pled guilty to the offense of murder in these cases.

[5]Nor did it match her husband's DNA.

[6]DNA tests were not performed on the box or the napkin until DNA testing became available more than a decade later.

[7]The stain was never tested, but the shelf was photographed. None of the employees remembered a stain on the shelf at the time they left the KFC on the night of the murders.

[8]Killingsworth was a manager at the KFC who left the restaurant about 5:00 p.m., but returned about 11:00 p.m. when called by the police.

10

there before the events of that night.[9] KFC employees testified that the box was the type used by the KFC, usually containing rolls of register tape, and that such a box would have been located on a shelf beneath the cash register.

During the years of investigation, Hartsfield gave a sworn written statement and grand jury testimony that he had never been to the KFC. He also denied that the blood on the box was his. However, after DNA testing proved it was his blood and other evidence showed that the box was the type used at the KFC, he was convicted of aggravated perjury. *Hartsfield*, 200 S.W.3d at 817. At trial, counsel for Hartsfield argued the State could not prove the box originated at the KFC.

Hartsfield argues that the bloody box is the only physical evidence linking him to the crime and that the State did not provide a plausible explanation for how his blood got on the box, other than a vague mention of a cut on his arm at some time in 1983. He also attacks the chain of custody of the box[10] because the evidence logs are missing, and none of the crime scene photographs show the box on the shelf or anywhere else in the KFC. Hartsfield questions the validity of the testimony regarding the box by attacking the somewhat conflicting testimony and actions of Ranger Elliott and Investigator Danny Pirtle: Elliott said he saw the blood on the box, but did not direct Pirtle to

---

[9]It was part of Ashley's job to straighten up the front of the restaurant and clean up any mess that was left there before she left for the night. She did not see any stain on the shelf.

[10]The chain of custody requirement for this box was previously litigated in Hartsfield's perjury trial and was discussed by this Court at length. *See Hartsfield*, 200 S.W.3d at 818, wherein it was found the box had distinctive markings (the blood spatter) which was recognized by the officer, which was a sufficient authentication of the item.

photograph it, there is no documentation of the box being found with blood on it, the box does not appear in any of the photographs, there is no documentation of the box being collected from the scene, and, of the ten rolls of film Pirtle took at the crime scene, only one was able to be developed. However, Elliott testified that on his walk-through of the KFC, he saw a box with blood spatter on it on a shelf beneath the register. At trial, he recognized the blood spatter on State's Exhibit 41 (the box) and identified it as the box he saw in the KFC.

### 3. The white van

Prior to the murders, as she was walking into the KFC with her boyfriend, Spagano saw a white van parked at the rear of the KFC, near the dumpster. She found it odd because there were no parking spaces there. She testified that after Hartsfield ordered and received his food, he and his companion both left the KFC[11] and walked toward the back of the KFC and that Spagano did not notice a vehicle leave the parking lot. Around closing time, when she and her boyfriend finished eating and left the KFC, she noticed that the white van was still parked in the same place.

Shortly after the KFC's closing time, Bobby Robinson was driving by the KFC and saw that only the lights in the back of the restaurant were on, that the back door of the KFC was open, and that a light-colored van was parked at the KFC's back door. He did not see anyone in the KFC or the van. Similarly, around 10:30, Linda Hardee was driving by the KFC and saw a light-colored

---

[11]Spagano testified that Hartsfield's companion did not order anything.

utility-type van parked near the back of the KFC, in the drive-through lane, facing the wrong way. She admitted that she did not see Hartsfield.

James Rowe, testifying for the defense, stated that near 10:00 that night, he saw a white Ford Econoline van, driven by a white man, leaving the KFC. Rowe said he almost collided with the van when it pulled out from the back of the KFC. He described the driver as a white male with long black hair and a long black, shaggy beard, wearing a toboggan-style cap (which could have been a mask) pushed back on his head. Rowe did not see any African-Americans in the van, but he did see three persons in KFC uniforms "hollering and screaming" in the van. The next day, he heard about the murders, but did not report his information immediately. Rowe stated that he attempted to report his information about two to three months later, even though he admitted that he told the grand jury that he did not attempt to report this until one year after the murders.

Marsha Williams lived next to the oil field where the victims' bodies were found. At 10:57 on the night of the murders, she saw a van, having only its parking lights on, pull into her driveway and stop there for a minute, before driving away. She admitted that she did not know what color the van was, but that it was her impression that it was a darker color. About seven to twelve minutes later, she heard what sounded like four rapid gunshots nearby. After a noticeable pause of approximately five minutes, she heard what sounded like one more shot. Gunshots were not unusual for the area, so she did not report it.

13

About a week after the murders, while driving into Kilgore, Sam Johnson nearly collided with a white "service-type" van when the driver of the van ran a stop sign. The van fit the description given by Spagano, Hardee, Rowe, and Robinson as the van seen at the KFC. Johnson identified Hartsfield as the driver of the van.

During his grand jury testimony, Hartsfield testified that he lived with Elton Winston in the early 1980s. In March 1984, Winston was arrested while driving a white utility van.

### E. Other Evidence

In addition to finding the bloody box, investigators also found a bloody napkin from the back work area of the KFC. Years later, a DNA test revealed the blood matched that of co-defendant, Pinkerton. At the scene of the murders, Opie Hughes was found some distance away from the other bodies. Semen was found in the crotch of her pants; on testing, it did not match either Hartsfield, Pinkerton, her husband, or any other suspect. DNA testing did reveal that the semen was deposited by a man who was predominantly of African-American descent.

Three of the victims were shot with two separate revolvers. Two victims were shot twice with the same weapon. Seven shots appeared to have the same rifling characteristics, and since revolvers only shoot six times, the ballistics expert concluded that one weapon must have been reloaded or there was a third gun involved.

**F.      Analysis**

Hartsfield relies on *Clayton*, 235 S.W.3d 772.[12]  In *Clayton*, the victim was found in a park

near a car he had borrowed.  The victim had been shot multiple times and died at the scene.  *Id.* at

774.  The defendant's fingerprints were found in the car, in the victim's blood.  *Id.* at 775.  No one

ever saw the defendant in the park at any time prior to or after the shooting, and no other evidence

linked the defendant to the victim.  *Id.*  The defendant testified in his own defense and said he came

upon the car with the victim inside and got in to try to help him, but said he panicked and ran away

without getting help.  The court held that the bloody fingerprints were not direct evidence that the

accused shot the deceased and did not, standing alone, sufficiently establish that the accused did so.

*Id.* at 780.  However, the Texas Court of Criminal Appeals held that the evidence was legally

sufficient evidence to uphold the defendant's conviction because the defendant fled the scene and

his explanation of how his fingerprints got in the car was implausible.  *Id.* at 782.  On remand for

a determination of factual sufficiency, the court of appeals upheld the conviction because

> weighing Clayton's dubious story against the cumulative force of the incriminating
> circumstantial evidence, and giving due deference to the jury's determinations as to

---

[12]Hartsfield also cites *Eiland v. State*, 509 S.W.2d 596 (Tex. Crim. App. 1974), and *Johnson v. State*, 530 S.W.2d 321 (Tex. Crim. App. 1975), for the point that fingerprints at the scene are insufficient to establish guilt.  However, factual sufficiency was not at issue in either case, so they are inapplicable.  In *Eiland* and *Johnson*, the issue was whether the trial court should have granted a requested instruction that fingerprint evidence was only circumstantial evidence of murder.  Such an instruction which requires that the circumstances "must exclude, to a moral certainty, every other reasonable hypothesis except the defendant's guilt . . ." has been determined to be a confusing and improper charge where the jury is properly instructed on the reasonable doubt standard of proof. *Hankins v. State*, 646 S.W.2d 191, 200 (Tex. Crim. App. 1981) (op. on reh'g).

the weight of the evidence and the credibility of witnesses, we cannot say that the evidence offered at trial, as a whole, clearly revealed that the conviction was inappropriate.

*Clayton v. State*, No. 13-03-00411-CR, 2008 WL 3850549, at *4 (Tex. App.—Corpus Christi June 5, 2008, pet. ref'd) (mem. op., not designated for publication) (citing *Johnson*, 23 S.W.3d at 8–9).

Hartsfield also cites *Vodochodsky v. State*, 158 S.W.3d 502 (Tex. Crim. App. 2005). In *Vodochodsky*, the court found factually insufficient evidence to support a finding that the defendant solicited, encouraged, directed, aided, or attempted to aid his roommate when his roommate prepared and executed a plan to lure police to his house so he could kill them before killing himself. *Id.* at 510. The defendant knew of the shooter's plan, bailed the shooter out of jail "to do this," and went with him to a gun shop where the shooter asked for and purchased various ammunition. The defendant was also present when the shooter made a false 9-1-1 call in order to bring the police to the shooter's residence. *Id.* at 505–08. In finding the evidence factually insufficient to support the defendant's conviction, the court held that "the overwhelming weight of the evidence mitigates against the conclusion that [the defendant] solicited, encouraged, directed, aided or attempted to aid [the shooter] in committing the offense." *Id.* at 510. The court stated that "[the defendant] had the bad luck of being the friend and roommate of a man determined to kill police officers and himself." *Id.* at 511. In so holding, the court noted that: 1) the defendant did not participate in the purchase of ammunition; 2) there was no evidence that the defendant actually did any affirmative act to assist the shooter with the plan; 3) it was never established that there was a second shooter; 4) the

16

inconsistencies in the defendant's statements were minor; 5) in urging the shooter to wait, because they did not yet have a plan, neither man specifically mentioned killing a peace officer; and 5) the defendant's mention that he bailed the shooter out of jail "to do this" did not mention that it was part of a plan to kill police officers. *Id.* at 510–11.

This case is similar to *Clayton* and distinguishable from *Vodochodsky* in that in addition to the physical evidence at the crime scene linking the defendant to the crime, there is also significant circumstantial evidence supporting a reasonable inference that Hartsfield participated in the charged offense.

The jury, as the trier of fact, is the sole judge of the credibility of the witnesses and the weight of the evidence. *Fuentes v. State*, 991 S.W.2d 267, 271 (Tex. Crim. App. 1999). When faced with a record that supports conflicting inferences, we presume the trier of fact resolved any conflict in support of the verdict. *See id.*; *Matson v. State*, 819 S.W.2d 839, 846 (Tex. Crim. App. 1991). Even if contradictory evidence or witness testimony is compelling, the jury is the sole judge of what weight to give to such testimony. *See Lancon v. State*, 253 S.W.3d 699, 705 (Tex. Crim. App. 2008); *see also Goodman v. State*, 66 S.W.3d 283, 285 (Tex. Crim. App. 2001). We are required to afford "almost complete deference to a jury's decision when that decision is based on an evaluation of credibility." *Lancon*, 253 S.W.3d at 705 (citing *Marshall*, 210 S.W.3d at 625).

To convict Hartsfield of the murders, under Section 7.02(b), the State had to prove: 1) that Hartsfield was a party to a conspiracy to commit aggravated robbery; 2) that capital murder was

17

committed by either Hartsfield or by someone who was acting with him; 3) that the capital murder was committed in furtherance of the conspiracy to commit aggravated robbery; and 4) that Hartsfield should have anticipated that capital murder could be the result of the aggravated robbery. TEX. PENAL CODE ANN. § 7.02(b). In order to convict Hartsfield of capital murder, it is not necessary that the State prove he personally shot the victims, merely that he was acting with others in the commission of an aggravated robbery, that the murders were committed in furtherance of the robbery, and that he should have anticipated that murder could be the result of the robbery.

In this case, there is evidence that Hartsfield was identified as one of the robbers and that his blood was at the scene of the crime. At least two persons participated in the robbery; Hartsfield had a male companion with him when he entered the KFC, stood in line, and then left and walked away. Hartsfield's blood and that of his cousin and co-defendant, Pinkerton, were found in the KFC. Forensic evidence indicates that at least two and possibly three perpetrators participated in the murders. At least two different guns were used to kill the victims, and due to the number of gunshot wounds, there is evidence that a third gun may have been involved.

Because there had to be a sufficient number of perpetrators to subdue four victims while another assaulted Mary Tyler and robbed the KFC, it is reasonable to infer that there were more than two perpetrators of the robbery. Considering the violent assault on Mary, the signs of a physical struggle within the KFC, and the abduction of the five KFC employees, it is reasonable to infer that

18

anyone involved in the aggravated robbery should have anticipated murder could be the ultimate result of the robbery.

The time line strongly suggests that Hartsfield, as a participant in the robbery, also participated in or committed the murders. The robbery was still in progress at 10:30 p.m. when Hardee saw a white van oddly parked at the KFC. At 10:57 p.m., Williams saw a van near the murder scene, and just a few minutes later, she heard several gunshots, then a noticeable pause of five minutes, and then one more gunshot. Located on small, country roads, the murder scene was fourteen miles from the KFC. About a week after the murders, Hartsfield was seen driving a white van similar to the one seen at the KFC.

From these facts, the jury was free to infer that the white van seen at the KFC during the robbery was the same van that Williams saw near the murder scene and the same van that Hartsfield was seen driving. Further, the short time period between the robbery and the murders allowed the jury to infer that Hartsfield and the other participants in the aggravated robbery also participated in the murders because there was no time for third parties, wholly unrelated to the aggravated robbery, to have subdued, kidnapped, and murdered the five victims. The evidence that multiple guns were used further supports an inference that Hartsfield must have at least anticipated that murders of the victims would occur following the robbery.

This is a classic situation in which the credibility of the evidence and witnesses is the paramount determination of the jury. Here, the proof is not so weak that it must be disregarded. We

19

find there is legally and factually sufficient evidence to support the jury's verdict and, therefore, we must defer to the jury's determination, assume that any conflicting evidence or inferences were resolved in favor of the guilty verdict, and overrule Hartsfield's first and second points of error.

## III.    The Trial Court Did Not Commit Error in Allowing Evidence of an Extraneous Offense

After Hartsfield rested, the State offered evidence that Hartsfield committed a similar extraneous crime three days after the KFC murders.  The State argued that Hartsfield's contention that someone else committed the KFC murders opened the door for admission of Hartsfield's similar extraneous offenses as direct and rebuttal evidence of Hartsfield's identity as one of the perpetrators of the KFC murders.  Hartsfield contended that the extraneous evidence was inadmissible because the mode or device of the extraneous offense was not sufficiently distinctive that it could be used to identify Hartsfield.[13]  The trial court overruled Hartsfield's objection, admitted the extraneous offense evidence for the limited purpose of identity, and gave a proper limiting instruction.  In his third point of error, Hartsfield asserts that the trial court abused its discretion in admitting the extraneous offense evidence.  We disagree.

A trial court's decision to admit or exclude evidence is reviewed under an abuse of discretion standard.  *McDonald v. State*, 179 S.W.3d 571, 576 (Tex. Crim. App. 2005); *Willover v. State*, 70 S.W.3d 841, 845 (Tex. Crim. App. 2002).  A trial court does not abuse its discretion so long as the decision to admit evidence is within the "zone of reasonable disagreement." *Montgomery v. State*,

---

[13]Hartsfield also argued that the State had uncontroverted direct evidence of Hartsfield's identity and the unfair prejudice of the evidence substantially outweighed its probative value.

810 S.W.2d 372, 391 (Tex. Crim. App. 1990) (op. on reh'g). An appeals court may not substitute its own decision for that of the trial court. *Moses v. State*, 105 S.W.3d 622, 627 (Tex. Crim. App. 2003). If the record supports the trial court's decision on the admission of evidence, there is no abuse of discretion, and the decision of the trial court will not be reversed. *Osbourn v. State*, 92 S.W.3d 531, 537 (Tex. Crim. App. 2002); *Montgomery*, 810 S.W.2d at 379.

Although the general rule is that evidence of extraneous crimes is not admissible, that evidence can be admitted if it satisfies the requirements of the following two-pronged test: (1) the offense is relevant to a material issue in the case, other than the issue of the defendant's character; and (2) the probative value of the evidence is not substantially outweighed by the danger of unfair prejudice. *Prieto v. State*, 879 S.W.2d 295, 297 (Tex. App.—Houston [14th Dist.] 1994, pet. ref'd). The material issues in each case are determined by the respective theories proffered by the State and the defense. *See Bush v. State*, 958 S.W.2d 503, 505 (Tex. App.—Fort Worth 1997, no pet.). For example, evidence of extraneous crimes may be admissible to show motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident. TEX. R. EVID. 404(b). If an objection is made to the admission of extraneous offense evidence, the proponent of the evidence must then meet the burden of persuading the trial court that the evidence has relevance apart from character conformity, that it tends to establish some elemental fact (such as identity), that it tends to establish some evidentiary fact (such as motive, opportunity, or preparation leading inferentially to an elemental fact), or that it rebuts a defensive theory. *Id.*; *Montgomery*, 810 S.W.2d at 387–88; *see*

21

*also Taylor v. State*, 920 S.W.2d 319, 321 (Tex. Crim. App. 1996). Put another way, the evidence must be relevant to a fact of consequence contested in the case. *See Prince v. State*, 192 S.W.3d 49, 54 (Tex. App.—Houston [14th Dist.] 2006, pet. ref'd).

Hartsfield put identity at issue in this case by contending that someone else, not he, committed the KFC murders. Throughout the trial, Hartsfield attacked or otherwise attempted to undermine any evidence that he committed any act to satisfy the elements of capital murder by supporting and advancing the theory that James Earl Mankins, Jr.,[14] or someone else, committed the charged crimes. Through both cross-examination of the State's witnesses and direct examination of his own witnesses, Hartsfield vigorously advanced the theory that Mankins or someone else, not he, had been one of the perpetrators of the KFC murders.

Once Hartsfield placed his identity in issue, the State could offer evidence of an extraneous offense to prove his identity if there was some distinguishing characteristic common to both the extraneous offense and the offense for which appellant was on trial. *Lewis v. State*, 674 S.W.2d 423, 425 (Tex. App.—Dallas 1984, pet. ref'd) (citing *Ford v. State*, 484 S.W.2d 727, 729 (Tex. Crim. App. 1972)); *see also Chambers v. State*, 601 S.W.2d 360, 362 (Tex. Crim. App. [Panel Op.] 1980); *Baize v. State*, 790 S.W.2d 63, 64 n.1 (Tex. App.—Houston [1st Dist.] 1990, pet. ref'd). A distinguishing characteristic is usually the accretion of small, sometimes individually insignificant,

---

[14]Mankins was originally a suspect based on the finding of a torn fingernail in one of the victim's jeans and an observation by officers that Mankins' right middle fingernail was torn off. After much attention was given to this theory, DNA testing in 1995 and 2003 determined the fingernail remnant did not belong to Mankins.

details that marks each crime as the handiwork or *modus operandi* of a single individual. *Segundo v. State*, 270 S.W.3d 79, 88 (Tex. Crim. App. 2008). No rigid rules dictate what constitutes sufficient similarities; rather, the common characteristics may be proximity in time and place, mode or manner of commission of the crimes, the person's dress, or any other elements which mark both crimes as having been committed by the same person. *Id.*

It is well-established law that sufficient similarity may be shown by the proximity in time and place of the extraneous offense to the offense for which the accused is being tried. *Johnson v. State*, 68 S.W.3d 644, 651 (Tex. Crim. App. 2002); *Lane v. State*, 933 S.W.2d 504, 519 (Tex. Crim. App. 1996); *Ford*, 484 S.W.2d 729–30. In *Ransom v. State*, 503 S.W.2d 810 (Tex. Crim. App. 1974), the court held offenses to be sufficiently similar when: (1) both offenses were robberies committed at gunpoint; (2) the defendant was aided by a confederate; and (3) the offenses occurred in the same area, three days apart. *Id.* at 813. Similarly, in *Poullard v. State*, both the extraneous offense and offense charged were robberies committed at gunpoint, in the same geographic area, four days apart, against a lone female victim working in a small store. 833 S.W.2d 273, 276 (Tex. App.—Houston [1st Dist.] 1992, pet. ref'd). In both cases, the court noted the close proximity in time and place between the extraneous offense and the offense charged.

Hartsfield relies on *Owens v. State*, 827 S.W.2d 911 (Tex. Crim. App. 1992), wherein the Texas Court of Criminal Appeals held an extraneous sexual assault inadmissible because the characteristics of the extraneous offense were not sufficiently similar to those of the charged offense.

The trial court admitted evidence of a prior sexual assault on the basis that such evidence established a "system," and the Texas Court of Criminal Appeals analyzed that basis as one relating to Owens' "modus operandi" or "methodology" and cited "identity" cases in support of its decision. *Id.* at 914–15. The defendant placed his hands inside the victims' garments, and both victims were the defendant's minor daughters and were of similar age at the time of the offense. *Id.* at 911. However, the court held the extraneous offense inadmissible and noted several important dissimilarities between the two alleged offenses. The offenses occurred years apart, and one of the assaults continued over a period of two years and included intercourse, whereas the other assaultive behavior consisted of only one isolated incident of illegal touching and digital penetration. *Id.* at 916.

Here, as in *Ransom* and *Poullard*, the two offenses are robberies committed at gunpoint and are also similar in their proximity in time and place. The offenses occurred three days apart and in the late evening or early night hours. The offenses occurred in the same geographic area, as one occurred in Tyler and the other occurred in nearby Kilgore. Eyewitness testimony places Hartsfield at the scene of the extraneous offense, and DNA evidence puts Hartsfield in the KFC on the night of the murders. Hartsfield had an African-American male accomplice with him during the extraneous robbery and when he was seen in the KFC before the murders. In both cases, the perpetrators used a revolver, emptied the cash register, and rifled through the shelves beneath the cash register. In the KFC, the money bags were stolen, and in the Tyler Food Mart, the perpetrators looked around and under the cash register and demanded a money bag.

In determining a level of similarity between the offenses sufficient to establish identity, we must take into account both the specific characteristics of the various offenses and the time interval between them. *Johnson*, 68 S.W.3d at 651. The exactness that might be required of an offense committed at a more remote period of time might not necessarily be required for an offense committed within a very short period of time. *Id.* Here, the two offenses are notably close in proximity in time and place, and share other significant similarities. For the foregoing reasons, we hold the extraneous offense evidence is relevant to prove identity and the trial court did not abuse its discretion in admitting the evidence.

Further, for this evidence to be admissible, it must be determined that the probative value of the evidence is not substantially outweighed by the danger of unfair prejudice. *Prieto*, 879 S.W.2d at 297. In making this determination, we should consider (1) how compellingly evidence of the extraneous offense serves to make a fact of consequence more or less probable, (2) the potential that the extraneous offense will impress the jury in some irrational but indelible way, (3) the trial time needed to develop the evidence, and (4) the proponent's need for the extraneous offense evidence. *Wheeler v. State*, 67 S.W.3d 879, 888 & n.25 (Tex. Crim. App. 2002) (citing *Lane v. State*, 933 S.W.2d 504, 520 (Tex. Crim. App. 1996)). We will examine each of these considerations.

(1)     The issue of identity was presented from the opening statement until the closing argument. The robbery in Tyler occurred three days after the robbery and murders in Kilgore. We

have previously listed the similarities in the robberies. The evidence is very probative on the issue of the identity of Hartsfield, a fact of major consequence.

(2) While evidence of extrinsic crimes are by their nature prejudicial to the defendant, the question is whether the jury is impressed in some irrational way. This evidence came before the jury after consideration by the trial court and was accompanied by an instruction of its limitations. A jury could rationally evaluate the import of the evidence on the issue of identity in accord with the trial court's instruction. The extraneous evidence was not as flagitious as the evidence in the primary case and should not create such prejudice that the jury could not consider it for the proper purpose. *See Taylor*, 920 S.W.2d at 323.

(3) The testimony concerning the extraneous offense consists of twenty-three pages in the reporter's record. The entire record consists of fourteen volumes, each of which is approximately 300 pages long. Compared to the entirety of the record, this was less than one percent of the total.

(4) This case was more than twenty-five years old by the time it was tried. Much of the evidence to connect Hartsfield to the murders was circumstantial and, as mentioned, the question of the identity of Hartsfield even as to the robbery was seriously contested. Under these circumstances, we find the State had a considerable need to present this evidence.

The trial court abuses its discretion in admitting this evidence only if the danger of unfair prejudice substantially outweighs the probative value. We find the trial court did not abuse its discretion in admitting the extrinsic crime evidence.

26

We affirm the judgment of the trial court.


Jack Carter
Justice

Date Submitted:    October 21, 2009
Date Decided:     February 4, 2010

Publish