

# In The
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

_____

No. 06-12-00193-CR

_____

DARREUS DEMONT WILLIAMS, Appellant

V.

THE STATE OF TEXAS, Appellee

On Appeal from the 196th District Court
Hunt County, Texas
Trial Court No. 26,975

Before Morriss, C.J., Carter and Moseley, JJ.
Memorandum Opinion by Chief Justice Morriss

MEMORANDUM OPINION

Darreus Demont Williams was convicted by a jury of aggravated robbery with a deadly weapon. Williams pled true to the State's enhancement allegation, was sentenced to twenty-three years' imprisonment, and was ordered to pay a $10,000.00 fine. On appeal, Williams argues that the evidence is legally insufficient to support his conviction.[1] We disagree with Williams and affirm the trial court's judgment.

Clayton Green was celebrating his birthday with his wife, Virginia Green, and his niece, Teresa Green, by playing the slot machines at Bonnie Lou's Game Room (Game Room) when a violent, armed robbery deprived the patrons of a fair chance at fortune.

The first sign that anything was awry was noticed by Virginia, who had stepped outside to call her nephew. Three armed, "dark-skinned" "Hispanic and black" men wearing hoodies[2] and bandanas covering their faces approached the establishment. Virginia was forcibly shoved by one of the men and "just went flying through the" double doors and back into the Game Room. Joanna Brock, who was also in the Game Room was surprised when the "double doors . . . burst open."

---

[1]Williams also appeals from the following convictions entered on the same date: aggravated assault against a public servant (cause number 06-12-00189-CR); aggravated assault by use of a deadly weapon (cause number 06-12-00190-CR); aggravated assault by use of a deadly weapon (cause number 06-12-00191-CR); and aggravated assault by use of a deadly weapon (cause number 06-12-00192-CR). The complete factual background giving rise to all of these convictions is the same and is set forth in our opinion of this date in cause number 06-12-00193-CR. Therefore, this opinion only discusses the facts necessary to decide this opinion.

[2]According to witnesses, it appears that robber Vincent Thomas wore a gray hoodie, another robber wore a blue hoodie, and the last wore a red or multi-colored hoodie. Witness Darlene Robinson testified, "[T]here was a gray one, and then two dark-colored ones."

Customer Andrew Collins testified, "A man in a gray hoodie and bandana covering his face pointed a gun up in the air and said, everybody down on the floor; I want your cell phone and your money. Shot his gun one time into the ceiling." The gunshot got the attention of everyone in the room. Brock recalled that "they were yelling, screaming, get down; get up; get in the corner; give me your cell phone." Virginia testified that, "they all had guns"[3] and "[t]hey just started hollering and [using] a lot of foul language and said that they were in charge of this M-F, and just started jumping and hollering." Virginia was scared and "didn't know whether they was [sic] going to shoot me." The man in a gray hoodie "grabbed my purse and my cell phone."

The three robbers spanned the room and executed a barrage of violence to ensure compliance with their commands. Brock saw one of the robbers "kicking somebody." Teresa testified, "[O]ne of the guys that was robbing the game room stuck the gun in my dad's face and kicked me a couple of times." Brock dialed 9-1-1, but did not speak into the cell phone. She testified, "[T]hen the next thing I – I didn't even get all the way up, and then he came up from behind and hit me in the head with, I assume, his gun. It was something hard and metal. I have a scar on my head up here. My eye was black and swelled shut for a week. When I came to, they were gone."

Brock's sister, Darlene Robinson, witnessed Brock's beating over the head with a firearm before she was also hit in the head by the same man. Robinson testified, "I guess he hit her harder than me because she immediately fell and her face went down on the floor. And at that

---

[3]Clayton also confirmed, "They all had guns."

point I still had my head raised because I was trying to cover her up. And then he hit me, and then my head went down with her." Robinson believed that she "was lucky. I just had a goose egg."

Collins testified, "[O]ne of them grabbed my collar while I was laying on the floor, raised me up to my knees, put a gun to my head and asked me where the person was that was in charge. . . . I knocked the gun away and told him not to point that gun at me, and then he hit me in the head three times with it." Collins started bleeding.

Shelbie Crisp, the Game Room employee, testified that "the men wanted to know who worked -- who was working. So I stood up and then they shoved me behind the counter and ordered me to open the safe, so I did." She opened the safe door, stepped away from the safe, "and they proceeded to put the money in a grocery sack themselves." Crisp testified,

> They proceeded to leave. No more than 30 seconds after they left through the front doors, one of them returned back in behind the counter where I was still, and ordered me to give them more money, which I told them I don't have anymore. That was all there was. And they proceeded to take the money that I had in my apron and take it also.

Crisp estimated that the criminals took a "minimum of [$]3,000" and "probably close to [$]6,000."

Teresa "ran outside . . . [a]s soon as . . . the last suspect left." She saw them leave in "a silver or gray color[ed], four-door" vehicle. "Two of the suspects were kind of heavier-set, like, chunky or whatever. And the guy by the door was skinny. You could tell he was black." When police arrived, Teresa provided the description of the vehicle and direction of travel.

Deputy David Arndt was first to arrive at the Game Room. He testified,

4

> The scene was chaotic. People were screaming and hollering; frantic. There was [sic] several individuals that were injured; bleeding from the head. There was some blood on the floor and there were some people in chairs holding their heads. There was a bullet hole in the ceiling; blood on the floor; on the carpet.

After speaking with witnesses, Arndt furnished the description of the vehicle and the robbery suspects to the police dispatcher.

Officer Joseph Fernandez, who was already on the way to the Game Room, was "advised that . . . the suspects had already left the scene eastbound on 276 in a silver car -- silver passenger car." He testified,

> There was [sic] three suspects. . . . I had only seen two or -- three or four vehicles eastbound because I was going westbound. I knew that one of the vehicles that had passed me had to be the suspect vehicle. . . . I turned my lights and sirens off and turned around waiting on a vehicle description. And as I was waiting, . . . there was another car in front . . . going well over the speed limit.

Officer Jeff Reese "passed a deputy going eastbound in pursuit of a small, four-door vehicle." Frenandez asked Reese "to turn around with me because I was behind what I believed was a suspect vehicle. I could see inside three males – or three shadows that appeared to be males. They appeared to be sort of panicked."

Fernandez testified,

> [A]bout the 34 and 276 intersection, they acted as if they were going to turn south on 34, but instead they kind of jerked back north. The light was green and they stopped and the passenger exited the vehicle. A black male exited the front passenger's side of the vehicle. He had blue gloves and a bag in his hand. And before I could even -- I was letting dispatch know where I was; at the intersection of 34 and 276. And I didn't even get a chance to put my car in park before he started shooting at me. So I dove out of my car.
> I believe I shot off one round. And I crawled to the back of my car. My car was still moving. I was crawling because I was on the ground. And I turned over on my butt, and I pointed my gun straight back thinking he'd be right behind me, but he come [sic] out the passenger's side of the car. I could see the glare of

5

my taillights kind of lighting him up. And he had the -- I was on the ground, and he was standing right above me and had the gun pointed straight at my head. And that's when I pointed my gun towards him and opened fire.

And once he hit the ground and I knew that he -- he wasn't able to attack me anymore, I stood up and went for the suspect vehicle, which had taken off northbound on 34. And I opened fire on the car thinking that they were going somewhere to hurt somebody else or something like that. By that time I -- [Reese] had got in behind them and they went northbound on 34. And I went back to my car, which was still rolling and jumped inside and put it in park and waited for the ambulance.

Reese was a "[h]undred or hundred and fifty" yards away when the gunfire exploded. As he approached the scene of the shooting, Reese noticed "a body in the road" and "saw the deputy running to his patrol unit." Thomas, the robber in the gray hoodie, died at the scene from multiple gunshot wounds. At the time of his death, he had ingested alcohol, marihuana, PCP, and Hydrocodone.

Meanwhile, Reese continued pursuit of the "little light-colored car headed north on 34 towards Greenville," which was travelling at a "high rate of speed." Reese remembered, "My vehicle does 94 miles an hour, and I could just barely keep up with them." By this time, other officers had also joined the chase. The other two suspects were apprehended after their getaway car succumbed to DPS-deployed spike strips. Reese identified the driver as Hispanic and the passenger as African-American. Both suspects, later identified as Williams and Guadalupe Ramirez, III, were "[h]ighly intoxicated," "[i]ncoherent, foaming at the mouth, and starting to throw up." They both began having seizures and were taken to the hospital. Williams had $430.00 in cash in his shoe.

At the scene of Thomas' death, Texas Ranger Laura Simmons found $5,143.00 inside a plastic grocery bag that was "laying on the road" where Thomas was shot. She also retrieved

6

Thomas' gun, a gray hooded sweatshirt, a bandana, and a cell phone from the scene.  At the scene of Williams' and Ramirez' arrests, Detective Tommy Granfield recovered bullets, a white t-shirt, a black hat, a light blue shirt, and several cell phones and discovered that the vehicle was registered to Thomas' girlfriend, Carla Thornton.  From the "east bar ditch" of "State Highway 34," the road where the spike strips were deployed, Officer J.E. Simpson retrieved a black undershirt and a black sweatshirt.

Detective Roger Seals spoke to Williams at the hospital.  Williams initially gave him a "fake name" and told Seals "that he had met two guys here in Greenville, and they was [sic] wanting to go to a party in Rockwall and that on the way to Rockwall he fell asleep in the car and he was asleep and didn't know what happened.  Said he was asleep until he heard gunshots and woke up."

At trial, Williams told a different story.  He testified that Thomas arrived at his home with Ramirez and asked Williams to accompany them to purchase drugs.  Williams testified that Ramirez was a stranger to him.  Nevertheless, Williams decided to go along for the ride.  Ramirez drove the vehicle to the Game Room, parked, and exited the vehicle with Thomas.  Williams testified that Thomas and Ramirez were speaking with another unidentified African-American male.  Williams was relaxing in the backseat, "dozed off," and was awakened by slamming car doors.  Williams denied knowledge of the robbery, claimed he did not have a gun, was not wearing a hoodie, and alleged that he was sober.

Rejecting Williams' testimony, the jury convicted him of aggravated robbery with a deadly weapon.  On appeal, Williams argues that the evidence is insufficient to prove that he

7

committed the crime because "Crisp was not able to identify Williams as one of the men who robbed her." Thus, Williams argues that "a jury could only have speculated that Williams was one of the men to rob Crisp or that he was a party to the offense."

In evaluating legal sufficiency, we review all of the evidence in the light most favorable to the jury's verdict to determine whether any rational jury could have found the essential elements of aggravated robbery with a deadly weapon beyond a reasonable doubt. *Brooks v. State*, 323 S.W.3d 893, 912 (Tex. Crim. App. 2010) (citing *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)); *Hartsfield v. State*, 305 S.W.3d 859, 863 (Tex. App.—Texarkana 2010, pet. ref'd). Our rigorous legal sufficiency review focuses on the quality of the evidence presented. *Brooks*, 323 S.W.3d at 917–18 (Cochran, J., concurring). We examine legal sufficiency under the direction of the *Brooks* opinion, while keeping in mind that the credibility of witnesses is the sole province of the jury and that we "must give deference to 'the responsibility of the trier of fact to fairly resolve conflicts in testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts.'" *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007) (quoting *Jackson*, 443 U.S. at 318–19); *Ehrhardt v. State*, 334 S.W.3d 849, 857 (Tex. App.—Texarkana 2011, pet. ref'd).

Legal sufficiency of the evidence is measured by the elements of the offense as defined by a hypothetically correct jury charge. *Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997). The hypothetically correct jury charge "sets out the law, is authorized by the indictment, does not unnecessarily increase the State's burden of proof or unnecessarily restrict the State's

8

theories of liability, and adequately describes the particular offense for which the defendant was tried." *Id.*

The indictment in this case alleged that Williams

> individually and acting together with **GUADALUPE RAMIREZ, III** did then and there while in the course of committing theft and with intent to obtain and maintain control of property of **SHELBIE CRISP** to wit: $5,527.00 in United States currency, without the effective consent of the said **SHELBIE CRISP** and with intent to deprive the said **SHELBIE CRISP** of said property, did then and there by using and exhibiting a deadly weapon, to wit: a firearm, intentionally and knowingly place **SHELBIE CRISP** in fear of imminent bodily injury.

Williams individually committed the offense of aggravated robbery with a deadly weapon if (a) while in the course of unlawfully appropriating property (b) without Crisp's consent (c) with the intent to deprive her of the property (d) Williams (e) intentionally or knowingly (f) threatened or placed Crisp in fear of bodily injury or death (g) while using or exhibiting a deadly weapon. TEX. PENAL CODE ANN. §§ 20.02(a) (2), 29.03(a) (2) (West 2011), § 31.03(a), (b) (1) (West Supp. 2012). A deadly weapon is "anything that in the manner of its use or intended use is capable of causing death or serious bodily injury." TEX. PENAL CODE ANN. § 1.07(a) (17) (B) (West Supp. 2012).

Under the law of the parties, "[a] person is criminally responsible as a party to an offense if the offense is committed by his own conduct, by the conduct of another for which he is criminally responsible, or by both." TEX. PENAL CODE ANN. § 7.01(a) (West 2011). "A person is criminally responsible for an offense committed by the conduct of another if: . . . acting with intent to promote or assist the commission of the offense, he solicits, encourages, directs, aids, or attempts to aid the other person to commit the offense." TEX. PENAL CODE ANN. § 7.02(a) (2)

9

(West 2011). Thus, Williams committed aggravated robbery with a deadly weapon as a party if he acted with intent to promote or assist Ramirez in the commission of the offense by encouraging, aiding, or attempting to aid him in the aggravated robbery of Crisp with a firearm.

The evidence was sufficient to convict Williams if he was physically present at the commission of the offense and encouraged its commission by words or other agreement. *Hartsfield*, 305 S.W.3d at 864 (citing *Ransom v. State*, 920 S.W.2d 288, 302 (Tex. Crim. App. 1994) (op. on reh'g)). In determining whether the accused participated as a party, the finder of fact may "look to events occurring before, during and after the commission of the offense, and may rely on actions of the defendant which show an understanding and common design to the prohibited act." *Ransom*, 920 S.W.2d at 302 (quoting *Cordova v. State*, 698 S.W.2d 107, 111 (Tex. Crim. App. 1985)); *see King v. State*, 29 S.W.3d 556, 564 (Tex. Crim. App. 2000); *Hartsfield*, 305 S.W.3d at 864.

By Williams' own admission, he was with Thomas and Ramirez as they drove to the Game Room. No one else was in the car with them. Witnesses testified that three armed men came in together and left together. Together, the men subdued the Game Room patrons through threats and violence, indicating planning and cohesion in the execution of the crime.

As soon as the men exited the Game Room, Teresa immediately followed and saw the men leave in the getaway car. She did not see a fourth robber. At 200 pounds, Williams matched the description of one of the robbers being a heavier-set African-American male.[4] By Williams' own admission, he was in the backseat of the car as it left the Game Room. Fernandez

---

[4]Ramirez weighs approximately 250 pounds.

stated that he spotted the getaway car and that it contained three suspects. When Williams was apprehended, he was wearing only an undershirt, even though the offense occurred on a presumably chilly February night. However, a black sweatshirt was found discarded, along with other clothing, in the pathway of the chase. Also, while a majority of the money was found in the bag carried by Thomas at the scene of the shooting, Williams was found with $430.00 in cash hidden in his shoe, a sum which the jury could have determined came from Crisp's apron.

As the trier of fact and sole judge of the credibility of the witnesses and the weight of the evidence, the jury was free to disregard Williams' self-serving testimony tending to suggest that he was an unwilling participant in the crime, especially since he initially provided officers with false identification, changed his story between the time he was interviewed by Seals and the time of trial, and claimed to have been "dead sober" at his arrest. *Hartsfield*, 305 S.W.3d at 869 (citing *Fuentes v. State*, 991 S.W.2d 267, 271 (Tex. Crim. App. 1999)).

We believe that the jury could reasonably conclude the three Game Room robbers were working together and that Williams was one of them. At a minimum, the jury could have found, even if Thomas was the main actor in the robbery, that Williams encouraged, aided, or attempted to aid in the aggravated robbery. Specifically, there was evidence from which the jury could have found that Williams aided Thomas to (a) unlawfully appropriate money from Crisp (b) without Crisp's consent (c) with the intent to deprive her of the money and that Williams aided Thomas in (d) intentionally or knowingly (e) threatening or placing Crisp in fear of bodily injury or death (f) while Thomas was using or exhibiting a deadly weapon.

Williams' sole point of error on appeal is overruled.

11

We affirm the trial court's judgment.

Josh R. Morriss, III
Chief Justice

Date Submitted:     July 26, 2013
Date Decided:       August 2, 2013

Do Not Publish