

# In The
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

No. 06-13-00010-CR

EMMA ANGELITA HENDERSON, Appellant

V.

THE STATE OF TEXAS, Appellee

On Appeal from the County Court at Law No. 1
Hunt County, Texas
Trial Court No. CR1200630

Before Morriss, C.J., Carter and Moseley, JJ.
Memorandum Opinion by Justice Moseley

MEMORANDUM OPINION

Emma Angelita Henderson was convicted by a jury of a second driving while intoxicated (DWI) offense, resulting in her being sentenced to serve 365 days' confinement in the Hunt County Jail and being ordered to pay a $2,000.00 fine.

> Driving while intoxicated is a Class B misdemeanor with a maximum term of confinement for 180 days. But under Penal Code § 49.09, it is a Class A misdemeanor, with a minimum term of confinement of 30 days, if it is shown on the trial of the offense that the person has previously been convicted of an intoxication-related offense. In that situation, the maximum confinement is one year. On the other hand, Penal Code § 12.43(b) provides that if a defendant convicted of a Class B misdemeanor has previously been convicted of a Class A or Class B misdemeanor or any felony, he is to be punished by confinement in jail for not more than 180 days or less than 30 days. So the Penal Code includes two separate statutes providing for potentially increased punishment in the case of a person's second offense of driving while intoxicated.

*State v. Morgan*, 160 S.W.3d 1, 4 (Tex. Crim. App. 2004) (footnotes omitted).

Henderson argues in her sole point of error on appeal that the evidence is legally insufficient to support her conviction. We disagree and affirm the trial court's judgment.

**Standard of Review**

In evaluating legal sufficiency, we review all the evidence in the light most favorable to the jury's verdict to determine whether any rational jury could have found the essential elements of driving while intoxicated beyond a reasonable doubt. *Brooks v. State*, 323 S.W.3d 893, 912 (Tex. Crim. App. 2010) (citing *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)); *Hartsfield v. State*, 305 S.W.3d 859, 863 (Tex. App.—Texarkana 2010, pet. ref'd) (citing *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007)). Our rigorous legal sufficiency review focuses on the quality of the evidence presented. *Brooks*, 323 S.W.3d at 917–18 (Cochran, J., concurring).

2

We examine legal sufficiency under the direction of the *Brooks* opinion, while giving deference to the responsibility of the jury "to fairly resolve conflicts in testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007) (citing *Jackson*, 443 U.S. at 318–19).

Legal sufficiency of the evidence is measured by the elements of the offense as defined by a hypothetically correct jury charge. *Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997). The hypothetically correct jury charge "sets out the law, is authorized by the indictment, does not unnecessarily increase the State's burden of proof or unnecessarily restrict the State's theories of liability, and adequately describes the particular offense for which the defendant was tried." *Id.*

**Definition of the Charged Offense**

Apropos in this case, under Texas law, a person is guilty of DWI if the person operates a motor vehicle in a public place while intoxicated. *See* TEX. PENAL CODE ANN. § 49.04 (West Supp. 2012). Henderson (who does not dispute the existence of a previous DWI conviction) contends only that the evidence was insufficient to prove the intoxication element of the offense for which she was charged. Intoxication by alcohol may be proved by either proof of impairment (i.e., loss of the normal use of mental or physical faculties), or proof of alcohol concentration of 0.08 percent or more (i.e., intoxication "per se"). TEX. PENAL CODE ANN. § 49.01(2) (West 2011); *Kirsch v. State*, 306 S.W.3d 738, 743 (Tex. 2010).

**Point on Appeal**

Henderson argues that the evidence is legally insufficient because "[a]t no point was any witness able to detect the odor of alcohol on the defendant until after she entered and then exited [a] home," no field-sobriety test was conducted, no blood-alcohol level was introduced, and there was "no way for [the arresting officer] to know if she had a natural slur." We examine whether the evidence is legally sufficient to show proof of impairment.

**Evidence at Trial**

Nathan McClain testified that after passing his destination, he turned down Dalton Street to "make a three-point turn about" in his automobile when a van following him lightly bumped his vehicle from behind. McClain related that the van (which he stated was then being driven by Henderson) struck his car again "on my front end" as he attempted to negotiate the three-point turn. According to McClain, Henderson appeared "like somebody who was under the influence of alcohol" and that she was yelling, cursing, and exhibiting slurred speech.

Kimberly Smith, a homeowner on Dalton Street, testified that "the van would charge at [McClain], then back up very rapidly and charge at him again. And at one point, it looked as if the van was actually pushing his vehicle backward towards the dead end of the road." Henderson, operating the van, was "honking her horn incessantly." Kimberly awoke her husband, Michael Smith, a retired police chief, due to the "commotion going on out on the street." Michael testified,

> We were at the corner of Walnut and Dalton. The van was heading towards our arbor and moving back around in the street. There was a passenger car that was rapidly moving. The van was driving aggressively towards the car. There was --

4

with all this commotion going on and our private property being nearby, where they could knock it over or tear it up, I picked up the phone and called 911.

Michael said that the van "backed into a gas meter . . . on the other side of" Dalton Street after he placed the emergency 9-1-1 call.

Kimberly recalled, "[Y]ou could hear the van strike something metal. And the only thing that was there was the gas meter." After the van struck the gas meter, "it pulled forward and hit [Kimberly's] arbor." Kimberly testified that Henderson leaned "completely out the window and starts screaming at me, 'Should I hit him again? Do you think I ought to hit him? Do you think I ought to hit him again?'" and described Henderson's cursing as being "[n]onstop." Kimberly, who had seen Henderson "when she's not drunk," told Henderson that "she was drunk and that she needed to go sleep it off." Henderson "pulled into [the Smiths'] neighbor's driveway" and "went into their home."

Very shortly thereafter, police officers arrived on the scene and made contact with Henderson at the Smiths' neighbor's home. Because Henderson "was physically hitting at the officers with her hands and her feet," the officers were forced to "restrain her and handcuff her." Michael heard Henderson "yelling police brutality" and witnessed her "throw herself to the ground." Michael believed Henderson could have been intoxicated due to her "erratic driving," "confrontational attitude," and her action of "screaming at the top of her lungs" when placed in the patrol car. McClain testified that Henderson spat at the officers.

Responding police officer, Joseph Ryan Jones, testified he arrived on the scene "[j]ust a couple minutes" after he "got a call of an accident" and saw Henderson "running from the [van] into the house." Jones testified Henderson exhibited slurred speech, bloodshot eyes, and "a

5

strong odor of alcohol coming from [her] breath." She asked Jones several times not to shoot her. Jones described Henderson as "belligerent for the entire encounter." "[S]he kept putting her hands in her pockets" despite being asked repeatedly not to do so, "wasn't cooperating, wouldn't walk, [and] was kicking at [officers]." Jones was forced to handcuff Henderson for his own protection and concluded that she was not "cooperative enough for us to do any kind of field sobriety test."

Henderson "continued to scream and cuss" at Jones as he informed her that she was being arrested for DWI and then read her the required *Miranda*[1] warnings. Henderson did not consent to give a blood specimen. Based on his interactions with Henderson, Jones concluded that Henderson was intoxicated and had lost the use of mental faculties. A videotape recording of the arrest, which depicted Henderson's slurred speech and belligerent behavior toward the police officers, was played for the jury.

Police Corporal Aaron Huddleston also responded to the call and testified that he believed that Henderson "was intoxicated [because of] the way she was speaking, slurring her words, and her eyes were kind of glassed over, bloodshot." Huddleston testified she was "unsteady on her feet" and "became very argumentative and combative." He "could also smell the smell of an alcoholic beverage coming from her breath and from her person." Huddleston further testified that Henderson "was impaired" and had lost the use of her physical faculties.

In summary of the evidence, (1) each witness at trial testified that Henderson appeared to be intoxicated and mentioned her belligerence; (2) the car Henderson piloted struck McClain's

---

[1]*See Miranda v. Arizona*, 384 U.S. 436 (1966).

vehicle, the gas meter, and the Smith's arbor; (3) Henderson then parked her van in the driveway of a nearby home and the arriving officers saw Henderson walk toward the house and enter it; (4) on their initial contact with Henderson (which took place very shortly after their arrival on the scene), the officers immediately smelled alcohol on her breath, and they observed that her speech was slurred, her eyes were bloodshot, she was unsteady on her feet, and she was extremely belligerent toward them. Jones testified that Henderson had lost the use of her mental faculties, and Huddleston testified that he had concluded that she had lost the use of her physical faculties. The jury was able to watch a video recording of much of the encounter between the law enforcement officers and Henderson.

**Conclusion**

We conclude that from these basic facts, it was reasonable for a rational jury to find that Henderson was driving while intoxicated. Because the evidence is legally sufficient to support Henderson's conviction, we overrule Henderson's sole point of error.

We affirm the trial court's judgment.


Bailey C. Moseley
Justice


Date Submitted:     October 22, 2013
Date Decided:       October 23, 2013

Do Not Publish


7