

# In The
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

No. 06-13-00246-CR

CAROL DARLENE HIMELRIGHT, Appellant

V.

THE STATE OF TEXAS, Appellee

On Appeal from the County Court at Law No. 1
Hunt County, Texas
Trial Court No. CR1300550

Before Morriss, C.J., Carter and Moseley, JJ.
Memorandum Opinion by Justice Carter

## MEMORANDUM OPINION

A jury found that Carol Darlene Himelright shoplifted several items at a Greenville, Texas, Walmart store and convicted her of theft of $50.00 or more but less than $500.00. The trial court placed Himelright on community supervision for twelve months after suspending her 180-day sentence and $250.00 fine. On appeal, Himelright argues that the evidence is legally insufficient to support the jury's verdict of guilt. We disagree. Finding the evidence legally sufficient to support Himelright's conviction, we affirm the trial court's judgment.

In evaluating legal sufficiency, we review all the evidence in the light most favorable to the jury's verdict to determine whether any rational jury could have found theft in the requisite amount beyond a reasonable doubt. *Brooks v. State*, 323 S.W.3d 893, 912 (Tex. Crim. App. 2010) (citing *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)); *Hartsfield v. State*, 305 S.W.3d 859, 863 (Tex. App.—Texarkana 2010, pet. ref'd) (citing *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007)). We examine legal sufficiency under the direction of the *Brooks* opinion, while giving deference to the responsibility of the jury "to fairly resolve conflicts in testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007) (citing *Jackson*, 443 U.S. at 318–19).

Legal sufficiency of the evidence is measured by the elements of the offense as defined by a hypothetically correct jury charge. *Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997). The hypothetically correct jury charge "sets out the law, is authorized by the indictment, does not unnecessarily increase the State's burden of proof or unnecessarily restrict the State's

theories of liability, and adequately describes the particular offense for which the defendant was tried." *Id.*

In this case, Himelright committed theft "if [s]he unlawfully appropriate[d] property with [the] intent to deprive the owner of property."[1] *See* TEX. PENAL CODE ANN. § 31.03(a) (West Supp. 2014). To be unlawful, Himelright's appropriation had to have been without the effective consent of the owner. *See* TEX. PENAL CODE ANN. § 31.03(b)(1) (West Supp. 2014). Theft is a class B misdemeanor if the value of the property exceeds $50.00 but is less than $500.00. TEX. PENAL CODE ANN. § 31.03(e)(2)(a)(i) (West Supp. 2014). Himelright argues that the State's evidence of criminal intent and of the value of the property taken are legally insufficient to support the finding of guilt.

At trial, Scotty Hanks, an asset protection associate for the Greenville Walmart, testified that shoplifters commonly employ two strategies in order to walk through checkout lanes without paying for shoplifted items. Hanks informed the jury that shoplifters often (1) purposefully fail to alert the cashier to items placed on the bottom rung of their shopping cart and (2) conceal items placed on the bottom of their shopping cart basket with other items. According to Hanks and his fellow asset protection associate, Tommi Weaver, Himelright employed both strategies.

Himelright first caught Hanks' attention when she placed a 1.5 gallon glass beverage dispenser on the bottom rung of her shopping cart and stacked multiple large bottles of Gain liquid detergent, Downy liquid fabric softener, and Clorox bleach on the bottom of the cart's basket. Hanks found Himelright's hoarding of multiple large items odd. He followed

---

[1]Appropriate means "to acquire or otherwise exercise control over property other than real property." TEX. PENAL CODE ANN. § 31.01(4)(B) (West Supp. 2014).

Himelright throughout the store for over an hour as she continued shopping. As she filled her cart with other items, Himelright covered the Gain, Downy, and Clorox. She also placed two cases of dog food beside the beverage dispenser on the bottom rung of the cart. When she was finished shopping, Himelright proceeded to the checkout lanes with a full buggy.

Hanks stood at the register adjacent to the register chosen by Himelright so that he could see the checkout transaction and clearly hear Himelright's conversation with the cashier. Himelright presented the cashier with several advertisements from other stores that depicted lower prices for certain items she had in her cart. In accordance with Walmart's price-match guarantee, the cashier began to manually override the prices for fourteen boxes of cornbread mix, twenty-four cans of dog food, two bottles of Dawn dishwashing liquid, five packages of beef tips, and certain items of produce. According to Hanks, Himelright was speaking with and distracting the cashier during the transaction.

Himelright did not place all of her items on the conveyor belt. Instead, according to Hanks and Weaver, Himelright placed sacked items that had already been scanned by the cashier over the Gain, Downy, and Clorox, which the cashier had not scanned, in order to conceal them. Hanks testified that Himelright only placed one bottle of Clorox and one bottle of Gain on the conveyor belt and never informed the cashier that there were multiple bottles of both products in her shopping cart. She placed no Downy on the conveyor belt. Weaver testified that Himelright reached down to the bottom rung of the shopping cart to place the canned dog food on the conveyor belt, but never alerted the cashier to the beverage dispenser that was next to the dog

4

food. According to Hanks, Himelright also covered the beverage dispenser with items that had been scanned and sacked. After paying a total of $135.63, Himelright exited the store.

Hanks and Weaver suspected that Himelright had not paid for all of the items in her shopping cart. They followed her to the parking lot, stopped her, and asked her to come back into the store to discuss the transaction. Once Himelright was secured, Weaver watched the video recording of Himelright's transaction, conducted an inventory of the items in her cart, compared the items in the cart against her receipt, and confirmed that Himelright had failed to pay for several items. While Himelright paid for one bottle of Gain and one bottle of Clorox, Weaver's investigation revealed that she did not pay for (1) an additional two bottles of Gain, (2) an additional four bottles of Clorox, (3) three bottles of Downy, and (4) the beverage dispenser. Additionally, Himelright failed to pay for a pair of jeans and liquid makeup foundation that she had hidden underneath her purse. A separate receipt showing the value of each of the unpaid items was created by Weaver during her investigation, and it was introduced as evidence at trial. The unpaid goods receipt and Hanks' testimony established that the total pre-tax value of the items not paid for was $116.55.

Hanks asked Himelright to explain. According to Hanks, Himelright first claimed that she had informed the cashier that there were additional items in the cart. Hanks, who saw and heard the checkout transaction, testified that Himelright's explanation was false.[2] In her second explanation, as recalled by Hanks, Himelright claimed that an asset protection associate from a Walmart store in Quinlan, Texas, gave her express permission to take the items from the

---

[2]On cross-examination, Hanks admitted (1) that he would not be able to hear Himelright if she had whispered to the cashier and (2) that he did not hear every single word spoken.

Greenville store because she had previously paid for and left the items in the Quinlan store. Hanks testified that this reason was also false because the asset protection department is not authorized to permit customers to take items from any store. According to Hanks, Himelright also claimed that she had previously purchased the jeans from Walmart, brought them into the store with the intention of exchanging them, but then decided to keep them and not to go through with the exchange. Hanks testified that Himelright did not have a receipt to confirm her prior purchase of the jeans.

After hearing Himelright's varied explanations, Hanks and Weaver called the Greenville Police Department. Officer Larry Henderson responded to the call and watched the video recording of the transaction.[3] Henderson's testimony confirmed that Himelright failed to place all of the items in her cart onto the conveyor belt and that she hid unpurchased items with sacked items that had already been processed by the cashier. In contradiction to her claim to Hanks, Himelright told Henderson that the jeans were an exchanged pair, even though there was no exchange receipt for the jeans. Henderson arrested Himelright after discovering that the value of the unpaid-for items was $116.55.

Himelright testified in her own defense at trial. She told the jury that the cashier's failure to pay attention to the transaction had caused a simple misunderstanding. Himelright claimed that, with respect to the beverage dispenser, Gain, Downy, and Clorox, the cashier (1) instructed her not to place the large items on the conveyor because they were too large and (2) told Himelright that she would scan the large items in the shopping cart with a portable scanning

---

[3]The video recording of Himelright's transaction was not introduced as evidence at trial.

device.  Himelright testified that she was stocking up on Gain, Downy, and Clorox because they were on sale elsewhere and she was attempting to take advantage of the price-match guarantee. She explained that, because the cashier was unsure of how to complete the manual override for the price-match, the customer service manager had to assist with the transaction, possibly distracting the cashier.  Himelright suggested that the cashier's oversight could have resulted in the failure to scan all of the items and swore that she walked out of the store only because she believed that she had paid for all of the items in her shopping cart.

Himelright testified that the liquid makeup foundation belonged to her and was inside of her purse.  She told the jury that an asset protection associate "grabbed" her purse in the parking lot and "took off with it," that she followed Hanks and Weaver into the store because she believed she was being robbed, and that she was surprised when they dumped out the contents of her purse, found the makeup, and accused her of stealing it.  Himelright maintained (1) that she brought the jeans into the store to exchange them, (2) that a receipt for the jeans was "halfway in and halfway out" of the back pocket, and (3) that she did not have a chance to show the receipt to the asset protection associates due to their rough treatment of her.  Himelright also denied telling Hanks the bizarre story that a Walmart asset protection associate in Quinlan gave her permission to take the items.

After Himelright's testimony, Asset Protection Manager Tracy Lee Lindsey testified that she was in the back of the Greenville Walmart when Himelright was brought in for questioning. Lindsey and Hanks testified that Himelright's purse was not searched because such a search

would be against Walmart's company policy. Both Hanks and Weaver denied grabbing Himelright's purse in the parking lot.

After hearing this evidence, the jury convicted Himelright of theft. Himelright argues that the evidence was insufficient to show (1) that she had the intent to deprive Walmart of the property and (2) that the amount of the theft was more than $50.00.

"Intent to deprive must be determined from the words and acts of the accused." *Griffin v. State*, 614 S.W.2d 155, 159 (Tex. Crim. App. [Panel Op.] 1981); *see Banks v. State*, 471 S.W.2d 811, 812 (Tex. Crim. App. 1971). If the accused offers an explanation of her possession of recently stolen property at the time of her arrest, "[t]he record must demonstrate that the explanation is either false or unreasonable before the evidence . . . support[ing] the conviction will be deemed sufficient." *Adams v. State*, 552 S.W.2d 812, 815 (Tex. Crim. App. 1977) (citing *Callahan v. State*, 502 S.W.2d 3 (Tex. Crim. App. 1973)); *see Dixon v. State*, 43 S.W.3d 548, 552 (Tex. App.—Texarkana 2001, no pet.). Whether the accused's explanation is false or unreasonable is a question of fact. *Adams*, 552 S.W.2d at 815; *Dixon*, 43 S.W.3d at 552.

Here, Hanks, Weaver, and Henderson all testified that Himelright failed to place all of the items onto the conveyor belt and instead began covering up the stolen items with sacked items that the cashier had already processed. Himelright testified that she was stocking up on Clorox, Gain, and Downy because they were on sale at another store and Walmart would match the other store's sale prices. Yet, even though Himelright paid for one bottle of Clorox and one bottle of Gain, the receipt from her transaction did not show that either the Gain or Clorox were price-

8

matched.[4]  On direct, Himelright testified that she did not have the opportunity to explain to Hanks and Weaver that she had a receipt for the jeans; however, during cross-examination, Himelright claimed she told Hanks and Weaver that she had a receipt for the jeans.  Hanks testified that there was no receipt for the jeans, and Henderson testified that there was nothing hidden in the pocket of the jeans where Himelright claimed to have left the receipt.  Himelright testified that Hanks and Weaver retrieved the makeup from her purse.  Both Hanks and Weaver denied grabbing or searching Himelright's purse and clarified that the makeup was underneath— not inside of—the purse.

Himelright's explanations at trial differed from the explanations she initially gave to Hanks and Henderson.  According to Hanks, Himelright first claimed that she had informed the cashier that there were additional items in her shopping cart.  Upon learning that Hanks had witnessed the transaction, Himelright claimed that an asset protection associate from another store had given her permission to take items from the Greenville store without paying for them. Himelright told Hanks that she brought a previously-purchased pair of jeans for exchange then decided not to exchange them, but she told Henderson that the jeans were an exchanged pair. Himelright testified that the jeans costing $19.94 and makeup costing $9.98 were hers, but claimed not to notice that the final cost of her transaction—$135.63—failed to account for an additional $86.08 worth of merchandise.

Based on the conflicts created by the testimony, the jury was free to determine that Himelright's explanations at trial were unreasonable and, thus, that she was not credible.  We

---

[4]Himelright's receipt contained a manual override note for each price-matched item.

find that the testimony of Hanks, Weaver, and Henderson, which (1) described Himelright's acts in concealing the merchandise and (2) detailed the inconsistencies in Himelright's explanations for her possession of the unpaid-for items, was legally sufficient to show Himelright's intent to deprive Walmart of the property. Further, based on the testimony of Hanks and Henderson and the receipts introduced into evidence, we find that the evidence was legally sufficient to establish that the value of the stolen items was more than $50.00 but less than $500.00. Accordingly, we overrule Himelright's sole point of error.

We affirm the trial court's judgment.


Jack Carter
Justice


Date Submitted:      August 21, 2014
Date Decided:       September 16, 2014

Do Not Publish

10