

# In The
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

_____

No. 06-14-00116-CR

_____

JOSEPH JOHN GRUBBS, Appellant

V.

THE STATE OF TEXAS, Appellee

On Appeal from the 354th District Court
Hunt County, Texas
Trial Court No. 29,417

Before Morriss, C.J., Moseley and Burgess, JJ.
Memorandum Opinion by Justice Burgess

## MEMORANDUM OPINION

Joseph John Grubbs was convicted by a Hunt County jury of unlawful possession of a firearm by a felon,[1] and after punishment was enhanced by prior felony convictions,[2] he was sentenced by the trial court to twenty-five years' confinement. This case was tried with a companion case, which is the subject of another pending appeal before this Court.[3] Grubbs filed a single, consolidated brief covering both appeals in which he contends that there is insufficient evidence to support his convictions. In this case, we find there was sufficient evidence to support the conviction and affirm the judgment of the trial court.

## I.      Standard of Review

In reviewing the legal sufficiency of the evidence, we review all the evidence in the light most favorable to the verdict to determine whether any rational jury could have found the essential elements of the offense beyond a reasonable doubt. *Brooks v. State*, 323 S.W.3d 893, 912 (Tex. Crim. App. 2010) (citing *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)); *Hartsfield v. State*, 305 S.W.3d 859, 863 (Tex. App.—Texarkana 2010, pet. ref'd) (citing *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007)). We examine legal sufficiency under the direction of the *Brooks* opinion, while giving deference to the responsibility of the trier of fact "to fairly resolve conflicts in testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate

---

[1]*See* TEX. PENAL CODE ANN. § 46.04(a)(1) (West 2011).

[2]*See* TEX. PENAL CODE ANN. § 12.42(a) (West Supp. 2014).

[3]In companion case 06-14-00117-CR, Grubbs appeals from his conviction of fraudulent possession of identifying information.

facts." *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007) (citing *Jackson*, 443 U.S. at 318–19).

Legal sufficiency of the evidence is measured by the elements of the offense as defined by a hypothetically correct jury charge. *Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997); *Horton v. State*, 394 S.W.3d 589, 592 (Tex. App.—Dallas 2012, no pet.). The hypothetically correct jury charge "sets out the law, is authorized by the indictment, does not unnecessarily increase the State's burden of proof or unnecessarily restrict the State's theories of liability, and adequately describes the particular offense for which the defendant was tried." *Malik*, 953 S.W.2d at 240.

Based on the indictment and the statute, to convict Grubbs, the State had to prove beyond a reasonable doubt that (1) Grubbs (2) was previously convicted of the felony offense of burglary of a building in cause number 27269 in the 354th Judicial District Court of Hunt County, Texas, and that (3) on or about August 12, 2013, (4) Grubbs (5) intentionally or knowingly (6) possessed a firearm (6) before the fifth anniversary of his release from confinement following his conviction in cause number 27269 or his release from community supervision, parole, or mandatory supervision.[4] *See* TEX. PENAL CODE ANN. § 46.04(a)(1).

---

[4]On appeal, Grubbs does not contest the sufficiency of the State's evidence that he was previously convicted of the felony offense in cause number 27269, the date of the alleged offense, or that such date was before the fifth anniversary of his release from confinement. The State presented sufficient evidence of these elements through the certified judgment in cause number 27269 showing a conviction for burglary of a habitation, a second degree felony, and a conviction date of April 5, 2011, the testimony of Detective Mike Johnston of the Greenville Police Department, who positively identified Grubbs as the person convicted in cause number 27269, and the testimony of Deputy Jay Swallow that the incident occurred on August 12, 2013.

Possession is defined as "actual care, custody, control, or management." TEX. PENAL CODE ANN. § 1.07(a)(39) (West Supp. 2014). To obtain a conviction for possession of a firearm, the State must show that the accused not only exercised actual care, control, or custody of the firearm, but that he was conscious of his connection with it and possessed it knowingly. *See Brown v. State*, 911 S.W.2d 744, 747 (Tex. Crim. App. 1995); *Smith v. State*, 118 S.W.3d 838, 842 (Tex. App.—Texarkana 2003, no pet.). "[E]vidence which affirmatively links him to it suffices for proof that he possessed it knowingly." *Brown*, 911 S.W.2d at 747. However, these affirmative links must demonstrate that "the accused was aware of the object, knew what it was, and recognized his or her connection to it." *Smith*, 118 S.W.3d at 842 (citing *Gill v. State*, 57 S.W.3d 540, 544 (Tex. App.—Waco 2001, no pet.)). The evidence showing these links may be direct or circumstantial, but the evidence must establish that the connection between the accused and the firearm is more than fortuitous. *Davis v. State*, 93 S.W.3d 664, 667 (Tex. App.—Texarkana 2002, pet. ref'd). Therefore, the mere presence of the accused at the location where a firearm is found is not sufficient, in and of itself, to establish his knowing possession. *See Evans v. State*, 202 S.W.3d 158, 162 (Tex. Crim. App. 2006). If combined with other evidence, however, his presence or proximity, combined with such other evidence, may be sufficient to establish this element. *Id.*

Some factors that may be legally sufficient, either alone or in combination, to circumstantially establish an accused's knowing possession of a firearm include: (1) his presence when a search is conducted, (2) whether the firearm was in plain view, (3) whether he was in close proximity to and had access to the firearm, (4) whether he had a special connection to the firearm, (5) whether he possessed other contraband when arrested, (6) whether he made incriminating

4

statements when arrested, (7) whether he attempted to flee, (8) whether he made furtive gestures, (9) whether he owned or had the right to possess the place where the firearm was found, (10) whether the place where the firearm was found was enclosed, (11) whether conflicting statements on relevant matters were given by the persons involved, and (12) whether his conduct indicated a consciousness of guilt. *See James v. State*, 264 S.W.3d 215, 219 (Tex. App.—Houston [1st Dist.] 2008, pets. ref'd (3)); *Bates v. State*, 155 S.W.3d 212, 216–17 (Tex. App.—Dallas 2004, no pet.); *Smith*, 118 S.W.3d at 842; *Nguyen v. State*, 54 S.W.3d 49, 53 (Tex. App.—Texarkana 2001, pet. ref'd), *overruled on other grounds by Fagan v. State*, 362 S.W.3d 796 (Tex. App.—Texarkana 2012, pet. ref'd). However, it is the logical force of the links, rather than the number of links, that is dispositive. *Evans*, 202 S.W.3d at 162; *Smith v. State*, 176 S.W.3d 907, 916 (Tex. App.—Dallas 2005, pet. ref'd). Further, the links need not exclude every other reasonable hypothesis but the defendant's guilt. *Brown*, 911 S.W.2d at 748.

In his sole point of error, Grubbs argues that since the firearm was not found in his actual possession, the State had the burden to present other evidence that affirmatively linked him to the firearm. He contends that there is insufficient evidence to establish such an affirmative link between him and the firearm found on the scene. Grubbs examines the evidence presented at trial in light of some of the non-exclusive factors set forth above, and concludes that since none of the factors are present, the State failed to establish an affirmative link to the firearm. The State contends the following evidence is probative of an affirmative link: the 9-1-1 caller claimed a firearm was being used, the firearm was in plain view, the firearm was discovered in the same area from which the officer saw Grubbs come into view, the firearm was a rare .25 caliber pistol, and

5

the officer found a .25 caliber bullet in Grubbs' hand that matched a bullet found in the chamber of the pistol. While we do not necessarily agree with the State's construction of the evidence, our own examination of the record in this case leads us to conclude that there is sufficient evidence establishing an affirmative link between Grubbs and the firearm and that it is sufficient to support an inference that Grubbs possessed the firearm.

## II.      Analysis of the Record

At trial, a recording of a 9-1-1 call made at approximately 10:30 p.m. on August 12, 2013, was played for the jury. On the recording, the caller, who identified himself as Mr. Robertson, stated that he wanted to report an incident of domestic violence. While he indicated that he could not tell for sure, he stated, "[I]it looks like the man's got a gun pointed at . . . his girlfriend's head." Robertson indicated that the couple was screaming and hollering and that he knew the couple who lived at the house, but could not recall their names. Later, Robertson affirmed that the man was holding something to the woman's head and that he believed it was a gun. The caller did not identify or describe the couple involved in the altercation other than as a man and his girlfriend. An unidentified woman then informed the 9-1-1 operator that she could hear the couple arguing, but could not see them since cars were blocking her view. Neither Robertson nor the unidentified woman were called as witnesses at trial.

Lieutenant Roger Seals of the Hunt County Sheriff's Department testified that when he tried to locate Robertson, he learned that he had passed away in January 2014. Seals also testified that he had talked with Mrs. Rose Robertson about the call in May 2014. Mrs. Robertson remembered the call, but did not tell him the names of the people involved in the incident. She

6

also told him of two or three other incidents that prompted 9-1-1 calls, including the August 12 incident, and provided him the names of the people involved in some of those incidents. Seals testified that Mrs. Robertson never mentioned Grubbs' name.

Deputy Jay Swallow of the Hunt County Sheriff's Department was the first officer to respond to the 9-1-1 call on the night of August 12. He testified that he saw a shirtless Grubbs emerge from behind some vehicles and then saw a female, whom he identified as Elizabeth Land, crying and upset. Based on his training and experience, Swallow testified that Land's demeanor was consistent with an ongoing domestic disturbance. Because the 9-1-1 caller mentioned a gun, Swallow detained Grubbs and placed him in handcuffs while Swallow investigated the situation. When he asked them about a gun, both Grubbs and Land denied that a gun was involved. Swallow then walked the area where he initially saw Grubbs emerge from behind two trucks in front of the house. When asked to describe the area from which he saw Grubbs emerge, Swallow testified, "There's a chain link fence that goes around the house, and it was on the outside of the chain link fence." Swallow described the specific spot that he saw Grubbs walk from as "[j]ust out of the darkness behind the vehicles."

Swallow testified that he found a .25 caliber Raven pistol and five debit cards, each with a different person's name on them, on the ground in "plain view next to a pickup truck in the yard," on the side and possibly somewhat underneath the vehicle.[5] He testified that a .25 caliber pistol is uncommon and that this was the first time he had come across one. Seals also testified that based

---

[5]There were three debit cards and two credit cards. Hereinafter, they will be referred to collectively as "debit cards."

on his training and experience, .25 caliber pistols are a rare find on the streets. On inspection of the pistol, he found one bullet in the chamber.

Grubbs told Swallow that he did not know anything about the gun or the debit cards. After placing the gun and debit cards in evidence bags, Deputy Swallow determined that Grubbs was a convicted felon and placed him under arrest. He testified that he then put Grubbs into his car and took him to a command post in Quinlan so he could be taken to jail. When Grubbs emerged from the patrol vehicle, Swallow found a .25 caliber bullet in Grubbs' clenched hand that was identical to the one he found in the chamber of the gun.

The State also introduced a video recorded by the camera (dash-cam) mounted on the dashboard in Swallow's patrol car. The recording shows that the area in which the house is located was dark and unlit. A black sports-utility vehicle (SUV) and the front of the house were partially illuminated by the patrol car's head lights and search light, and no people were initially visible. A chain-link fence approximately thirty-six inches in height and situated between the SUV and the front yard, was likewise visible. The recording depicts Grubbs coming from the left, an unlit area in the front yard, with his hands raised. The chain-link fence separated him from both the SUV and Swallow. Swallow approached Grubbs and shined a flashlight on him while Grubbs climbed over the fence. After a brief conversation, Swallow cuffed Grubbs' hands behind his back. Land then emerged from the same area where Grubbs had been, also on the front-yard side of the chain-link fence. Swallow approached the chain-link fence to talk with Land, and Grubbs walked to the side of the SUV out of the view of the dash-cam. Swallow then walked in Grubbs' direction, and shortly thereafter, Grubbs is seen lying on the ground next to the SUV. Swallow then approached

8

Land, who climbed over the chain-link fence. Land and Swallow conversed at the rear of the SUV for approximately two minutes. Land remained to the right of the SUV and can be seen wiping her face, eventually sitting down and covering her face with her hands.

Swallow testified that the dash-cam recording portrayed Grubbs coming from behind two vehicles and that the distance between the chain-link fence and the vehicles was probably five feet. Swallow confirmed that he found the gun and the debit cards between the vehicle and the fence, but under the car, so that when he was walking past he could not plainly see them.

On cross-examination, Swallow testified that when he arrived on the scene, he saw two vehicles, a red pickup truck and a dark-colored SUV, and that he did not know who owned the vehicles. He affirmed that the vehicles were on one side of the chain-link fence and that Grubbs and Land were on the other side. He also confirmed that when the recording depicted Grubbs walking along the fence line, Land was out of sight and in the darkness in the direction of the truck. He testified that the truck was a couple of feet from the SUV and that when he first walked up, Land was in the area of the truck and SUV. Swallow did not recall whether he knocked on the door of the house or went around to the back, but thought he stayed in the front area to the left side of the house, near the truck and SUV. He testified that an unidentified female came out of the house and spoke with the officers, and he acknowledged that there could have been more people in the house.

Swallow did not know where the Robertsons lived and had no knowledge of their line of sight relative to the scene. Swallow did not know if anyone else had been in the yard prior to his arrival and did not know who lived in the house. Swallow acknowledged that anybody could have

9

possessed the gun and debit cards and that he never saw Grubbs with the gun or the debit cards, only with a bullet in his hand, which Swallow found approximately one hour after finding the gun. He also acknowledged that it was possible that Land had the gun and that some other man and woman could have been arguing.

Land testified that Grubbs is the father of her child and that they broke up in 2011. According to Land, the house where the incident took place belonged to her sister, Ashley Gray, and Ashley, Ashley's husband, and their two children live in the house. Land testified that she and Grubbs arrived at the house in Grubbs' red pickup truck approximately twenty-five minutes before the police encounter. According to Land, when they arrived, Land's cousin, Cody, was sitting on the porch. When she and Grubbs began arguing, Cody went inside the house, leaving only Grubbs and Land in the yard to continue their argument. Land testified that there were four vehicles at the house: Grubbs' truck, her brother-in-law's pickup truck, her sister's SUV, and a broken down car. Land testified that she and Grubbs had been arguing and claimed that was why she had been crying. She denied possessing the gun or debit cards at any time that day. She testified that the chain-link fence has a gate with a latch on the other side of the car that cannot be seen on the recording.

Land further testified that the Robertsons lived across from her sister's house and that the Robertsons knew Grubbs and her. Land claimed that when the police arrived, both she and Grubbs were on the other side of the chain-link fence from the vehicles. Although she admitted that they had been arguing, she denied that Grubbs put a gun to her head or ever knocked her to the ground. She told the police that night that she had never seen the .25 caliber gun and that she knew it did

10

not belong to Grubbs. She also denied knowing who possessed or owned the gun or the debit cards. Land said that she never saw Grubbs with a bullet that day. Although she acknowledged telling the State at one point that Grubbs may have gotten the bullet out of his ashtray with his change, she said she was only offering an explanation of how he might have come into possession of the bullet. She testified that she never saw Grubbs with the gun, the bullet, or the debit cards.

We agree with Grubbs that most of the non-exclusive factors that have been recognized by our courts as establishing an affirmative link between the accused and the contraband are not present in this case. However, absence of those factors is not evidence of the innocence of the accused that is to be weighed against any factors that may be present. *James*, 264 S.W.3d at 219. While much of the trial testimony lacks clarity, when viewed in the light most favorable to the verdict, it nevertheless provides sufficient evidence from which a reasonable jury could find that Grubbs knowingly possessed the firearm.

First, Land testified that she and Grubbs arrived at the house in his red pickup truck about twenty-five minutes before Swallow. She also confirmed that for the majority of the time before Swallow arrived, only she and Grubbs were in the front yard. Swallow testified that there were only two vehicles in front of the house, a dark-colored SUV and a red pickup truck. He testified that when he walked up, he observed Grubbs coming from the area of the pickup truck and that the area was outside the chain-link fence. Although Grubbs was clearly on the inside of the chain-link fence when he first came into view on the dash-cam recording, Land testified that there was a gate in the chain-link fence in the area of the vehicles. Thus, Land's testimony gave the jury a

11

means of resolving this seeming conflict between the recording and Swallow's testimony and of crediting Swallow's testimony that he originally saw Grubbs outside the fence by the pickup truck.

Swallow also testified that he found the .25 caliber pistol and the debit cards on the ground beside and slightly underneath a pickup truck. Since Swallow maintained that there was only a red pickup truck and a dark SUV present and Land identified Grubbs' pickup truck as red in color, the jury could reasonably infer that the contraband was found next to Grubbs' pickup truck. Both Swallow and Seals testified that a .25 caliber pistol is an uncommon pistol. Finally, Swallow testified that when he took Grubbs to the transfer facility, he discovered that Grubbs was holding a .25 caliber bullet in his hand and that the bullet was identical to the one found in the chamber of the pistol. Since Grubbs was in possession of an uncommon caliber bullet that matched a bullet found in the pistol, a jury could reasonably infer Grubbs' connection with the firearm.

When considered together, this evidence affirmatively links Grubbs to the firearm. We conclude that the evidence is sufficient to link Grubbs to the firearm and that a rational jury could find that Grubbs knowingly possessed the firearm. We overrule Grubbs' sole point of error in this cause.

Based on the foregoing, we affirm the trial court's judgment.


                                        Ralph K. Burgess
                                        Justice

Date Submitted:      June 30, 2015
Date Decided:        July 8, 2015

Do Not Publish