

# In The
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

_____

## No. 06-11-00227-CR
_____


BOBBY GLENN CANIDA, Appellant

V.

THE STATE OF TEXAS, Appellee



On Appeal from the 6th Judicial District Court
Lamar County, Texas
Trial Court No. 24466



Before Morriss, C.J., Carter and Moseley, JJ.
Opinion by Justice Moseley

OPINION

Bobby Glenn Canida was convicted by a jury of the manufacture of methamphetamine in an amount of more than one gram but less than four grams. Canida was sentenced to eighty years' imprisonment after pleas of true to the State's enhancement paragraph. In a sole point of error, Canida challenges the legal sufficiency of the evidence supporting his conviction. Because we find the evidence legally insufficient to demonstrate that Canida manufactured more than one gram of methamphetamine, we reverse the trial court's judgment and render a judgment of acquittal.

## I. Standard of Review

In evaluating legal sufficiency, we review all the evidence in the light most favorable to the trial court's judgment to determine whether any rational jury could have found the essential elements of the offense beyond a reasonable doubt. *Brooks v. State*, 323 S.W.3d 893, 912 (Tex. Crim. App. 2010) (citing *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)); *Hartsfield v. State*, 305 S.W.3d 859, 863 (Tex. App.—Texarkana 2010, pet. ref'd). Our rigorous legal sufficiency review focuses on the quality of the evidence presented. *Brooks*, 323 S.W.3d at 917–18 (Cochran, J., concurring). We examine legal sufficiency under the direction of the Brooks opinion, while giving deference to the responsibility of the jury "to fairly resolve conflicts in testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate

2

facts." *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007) (citing *Jackson*, 443 U.S. at 318–19).[1]

Canida challenges the finding that he manufactured more than one gram of methamphetamine. The Controlled Substances Act's definition of "manufacture" includes the production, preparation, propagation, compounding, conversion, or processing of a controlled substance, and includes the packaging or repackaging of the substance. TEX. HEALTH & SAFETY CODE ANN. § 481.002(25) (West 2010). "Proof sufficient to show any of the procedures" listed in the Act's definition of manufacturing is sufficient to support a conviction of the manufacture of a controlled substance. *Fronatt v. State*, 630 S.W.2d 703, 704 (Tex. App.—Houston [1st Dist.] 1981, pet ref'd); *see Green v. State*, 930 S.W.2d 655, 657 (Tex. App.—Fort Worth 1996, pet. ref'd).

## II. Factual Background

Narcotics investigator Anson Amis was monitoring pseudoephedrine purchases at local pharmacies when Canida's "name popped up."[2] Amis obtained a warrant to search Canida's camper and shed, which were located on Canida's mother's property. During the execution of the search warrant, Canida, Jimmy Jackson, Yvonne,[3] Tiffany Anderson, and Chad Sartor were

---

[1]We measure the elements of the offense as defined by a hypothetically correct jury charge. *Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997). Such a charge is one that accurately sets out the law, is authorized by the indictment, does not unnecessarily increase the State's burden of proof or unnecessarily restrict the State's theories of liability, and adequately describes the particular offense for which the defendant was tried. *Id.*

[2]Amis explained that "[e]ach pharmacy has their own system to where law enforcement can view real-time transactions of subjects buying ephedrine," a key ingredient in the manufacture of methamphetamine.

[3]Yvonne's last name was not in the record received by this Court.

3

present. Amis testified that those names were also included on the pharmacy logs he had been investigating.

Amis testified that he found evidence of a methamphetamine laboratory. He located the following items: thirty pills of cold medicine containing pseudoephedrine, lithium batteries, rubbing alcohol, Epsom salt, lighter fluid, plastic tubing, foil, digital scales, a larger Ziploc with "a bunch of smaller Ziploc bags," used and unused syringes, coffee filters containing "a white, powder substance," a police scanner, and a Gatorade bottle and glass jar (that could both be used to make methamphetamine using the "Nazi-Birch" shake and the bake method). "[I]nstant hot and cold packs" containing ammonium nitrate and batteries that "had been cut and taken apart" to extract lithium, both key ingredients in the manufacture of methamphetamine, were found inside of a green burn barrel located on the property. Amis explained that coffee filters can be used "[t]o separate your finished product." A lime salt bottle, which tested positive for methamphetamine, was also recovered.

Officer Tommy Moore testified that the "Nazi-Birch" method could produce methamphetamine in "30 to 45 minutes." He explained that key ingredients, such as pseudoephedrine, alcohol, lye (or another petroleum solvent such as camp fuel), are first shaken in a bottle. Next, lithium is added to start the chemical reaction, and the cooker then "drain[s] off the pressure" as the ingredients continue to react. Once the reaction is completed, a "pure liquid substance, which is going to be liquid methamphetamine[,]" is produced, and tubing is used to separate gases from the liquid. Moore testified that once a white substance is produced in the bottle, it is strained through a coffee filter and allowed to dry to create the final product.

4

Both Amis and Moore testified that the pills found were capable of producing more than one gram of methamphetamine. Specifically, Moore stated that it was "obvious to me that the defendant is producing and manufacturing methamphetamine" and that up to four grams could be produced using the ingredients found in Canida's possession.

Canida was arrested and interviewed. Canida admitted to using syringes to inject himself with methamphetamine, and needle marks were found on his person. Canida's initial interview was played for the jury. During a second interview, he admitted that he had recently made methamphetamine in a Gatorade bottle using pseudoephedrine purchased by Trasa Whitley, Cheryl Hixson, Shad Sawyer, and Jeff Lawson—all names that were flagged by Amis during his review of pharmacy purchase records. His mother, Ruby Louise Taylor, testified that Canida was previously incarcerated for the manufacture of methamphetamine.

Amis admitted during cross-examination that at least two key ingredients in the manufacture of methamphetamine, such as sulfuric acid, muriatic acid, and lye, were not found on the premises. In addition to highlighting this evidence, Canida points out that he lives on the property with his seventy-three-year old mother, several others were present during Amis' search,[4] the pseudoephedrine and batteries were in unopened packages, none of the items were tested for Canida's fingerprints, and the only item sent to the laboratory which tested positive for an "unknown quantity of methamphetamine" was the lime salt container. Complaining that no other methamphetamine was located, Canida argues that the evidence was legally insufficient.

---

[4]Although an accused's mere presence at the scene of a drug laboratory is insufficient to support a conviction for drug manufacture, it is a circumstance tending to prove guilt that when combined with other facts, shows that the accused was a participant in the manufacture. *Green*, 930 S.W.2d at 657. Here, Canida lived on the property where the shed was located and admitted to manufacturing methamphetamine.

## III. The Evidence Was Not Legally Sufficient to Convict Canida

To support his argument, Canida cites to the unpublished case of *Honeycutt v. State*. In that case,[5] officers executing a search warrant arrived at a residence where Honeycutt was known to be residing. *Honeycutt v. State*, No. 07-02-0504-CR, 2005 WL 924879, at *1 (Tex. App.—Amarillo Apr. 20, 2005, no pet.) (not designated for publication). Mike Marsh answered the door and told the officers that Honeycutt was not present, but he was found hiding under a bed. *Id.* Officers recovered a lighted butane torch, lithium batteries, plastic tubing, four small plastic bags containing methamphetamine, a modified mercury light bulb, a "haz mat" suit, two syringes containing methamphetamine, a bag containing pills, and a digital scale. *Id.* At trial, officers referencing the pills stated that "usually tablets like this contain pseudoephedrine" and that the tablets "appeared to be over the counter medications containing pseudoephedrine." *Id.* at *1–2. The Amarillo court reversed Honeycutt's conviction for manufacturing methamphetamine. The court reasoned that because "officers found no physical evidence of the occurrence of any stage of the manufacturing process," there was no evidence that "'cooking' or [a] similar procedure[] [was] occurring." *Id.* at *4. The opinion continued:

> There is nothing to indicate the burning torch officers found sitting on the coffee table was being used to apply heat to any chemical mixture, precursor or substance. Other than the bag of tablets containing pseudoephedrine, no chemical used in any stage of the manufacturing process was present. Moreover, there is no physical evidence that such procedures had occurred. No residue of manufacturing was found.

---

[5]We note that unpublished cases have no precedential value, but we may take guidance from them "as an aid in developing reasoning that may be employed." *Carrillo v. State*, 98 S.W.3d 789, 794 (Tex. App.—Amarillo 2003, pet. ref'd).

6

*Id.* In other words, while the plastic tubing, batteries, and haz mat suit "could play a role in manufacturing methamphetamine, . . . no evidence indicated those items had been used in any manufacturing process." *Id.* at *5.

Here, there was evidence that Canida was cooking methamphetamine. During his initial interview, Canida admitted to manufacturing methamphetamine and shared the method he used with officers. In a second interview, he admitted that others had brought him pseudoephedrine to make methamphetamine. In addition to the unused items recovered, which were consistent with the operation of a methamphetamine laboratory, used hot and cold packs and batteries which were stripped of lithium were found in the burn pile. Coffee filters containing a white, powdery substance, which officers testified were used to separate the final product, and a needle containing clear liquid, which the jury could have deduced was liquid methamphetamine, were also found. Therefore, we find that a rational trier of fact could have found that Canida was engaged in the manufacture of methamphetamine.

In addition to proving the manufacture of methamphetamine, the State was required to prove that more than one gram of methamphetamine was produced. *Goff v. State*, 777 S.W.2d 418, 420 (Tex. Crim. App. 1989). To support his contention that the State failed in this regard, Canida cites to *Brumit v. State*. 42 S.W.3d 201 (Tex. App.—Fort Worth 2001, pet. ref'd). After a search warrant of Brumit's residence yielded "laboratory equipment and chemicals consistent with a methamphetamine lab," Brumit was convicted of manufacturing four grams or more but less than 200 grams of methamphetamine. *Id.* at 202. "During trial, the State proved that roughly 0.34 grams of actual methamphetamine were found during the execution of the warrant

on coffee filters and trace amounts were found on other containers." *Id.* at \*203. "[T]he State relied on testimony about how much methamphetamine could have been produced from the empty containers of ingredients for methamphetamine" to "prove up the remaining amount." *Id.* In overturning Brumit's conviction, the court focused on the fact that the State was "attempting to prove past manufacture of a controlled substance with empty containers and leftovers, not chemicals on hand." *Id.* at 204. The court reasoned, "[w]hile this evidence may prove methamphetamines were manufactured in the past, it is insufficient to show the *amount* of methamphetamine manufactured in the past. . . . Furthermore, we hold that the evidence is insufficient to prove that Appellant had the capability of manufacturing more than four grams of methamphetamine in the future with the items the police found during their search." *Id.*

Here, it is undisputed that a few key items required to make methamphetamine were not located. Thus, the record does not demonstrate that Canida "had sufficient chemicals on hand for an output of [one gram] or more" in the future. *Goff*, 777 S.W.2d at 420. We now examine the evidence regarding Canida's past manufacture.

To convict a defendant of manufacturing methamphetamine, the State must prove that the defendant was manufacturing methamphetamine at the time of his arrest and prove the aggregate weight of the controlled substance including adulterants and dilutants. *Hardie v. State*, 79 S.W.3d 625, 631 (Tex. App.—Waco 2002, pet. ref'd) (citing *Goff*, 777 S.W.2d at 420; *Brumit*, 42 S.W.3d at 203–04). Canida admitted that he manufactured methamphetamine for his own consumption and that he is an addict. Canida admitted to manufacturing methamphetamine using psedoephedrine purchased by others. He stated in his initial interview that he

manufactured methamphetamine in a Gatorade bottle and that he yields 2.2 grams of methamphetamine per every twenty-count box of pseudoephedrine used. He also stated that he could make 1.5 grams of methamphetamine in forty-five minutes. Amis testified that Canida was describing the recent production of methamphetamine during his initial interview. However, our review of the interview suggests that this could be a conclusion not based on his statements. In the initial interview, Canida stated he had been using methamphetamine since December 2010. He was arrested for this offense on or about April 5, 2011. In the interview, Canida was asked regarding the manufacture of methamphetamines, "How would you do it?" In response to that question, Canida revealed a detailed knowledge of the methodology for making methamphetamine and told the interviewers how much of the drug could be expected to be derived from materials he described. He did not testify, however, as to the amount of methamphetamine that he actually produced, only that he "could" produce a certain amount of the illicit drug from a determined quantity of raw materials. The State had the burden to prove that the quantity of methamphetamine actually produced exceeded one ounce, but did not do so. Therefore, we find the evidence legally insufficient to sustain Canida's conviction. Canida's sole point of error is sustained.

## IV.    Conclusion

We reverse the trial court's judgment and render a judgment of acquittal.


Bailey C. Moseley
Justice

Date Submitted:    September 21, 2012
Date Decided:    November 27, 2012

Publish