

# In The
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

_____

No. 06-18-00042-CR

_____

ROBERT BRUCE SWAPSY, Appellant

V.

THE STATE OF TEXAS, Appellee

On Appeal from the 123rd District Court
Panola County, Texas
Trial Court No. 2017-C-0196

Before Morriss, C.J., Moseley and Burgess, JJ.
Opinion by Justice Moseley

A Panola County jury found Robert Bruce Swapsy guilty of unlawful possession of a firearm by a felon. The trial court sentenced Swapsy to eight years' imprisonment and ordered him to pay a $10,000.00 fine, but suspended the sentence in favor of placing Swapsy on community supervision for five years. In his sole point of error on appeal, Swapsy argues that the evidence is legally insufficient to sustain his conviction.

We find that legally sufficient evidence supports Swapsy's conviction. However, we modify the trial court's judgment to correctly reflect that he was convicted by a jury and that there was no plea bargain agreement. We affirm the trial court's judgment, as modified.

## I. Legally Sufficient Evidence Supports Swapsy's Conviction

### A. Standard of Review

In evaluating legal sufficiency, we review all the evidence in the light most favorable to the trial court's judgment to determine whether any rational jury could have found the essential elements of the offense beyond a reasonable doubt. *Brooks v. State*, 323 S.W.3d 893, 912 (Tex. Crim. App. 2010) (citing *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)); *Hartsfield v. State*, 305 S.W.3d 859, 863 (Tex. App.—Texarkana 2010, pet. ref'd). Our rigorous legal sufficiency review focuses on the quality of the evidence presented. *Brooks*, 323 S.W.3d at 917–18 (Cochran, J., concurring). We examine legal sufficiency under the direction of the *Brooks* opinion, while giving deference to the responsibility of the jury "to fairly resolve conflicts in testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Hooper v. State*,

2

214 S.W.3d 9, 13 (Tex. Crim. App. 2007) (citing *Jackson*, 443 U.S. at 318–19); *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007).

Legal sufficiency of the evidence is measured by the elements of the offense as defined by a hypothetically correct jury charge. *Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997). The hypothetically correct jury charge is "one that accurately sets out the law, is authorized by the indictment, does not unnecessarily increase the State's burden of proof or unnecessarily restrict the State's theories of liability, and adequately describes the particular offense for which the defendant was tried." *Id*.

Section 46.04 of the Texas Penal Code states, in relevant part,

A person who has been convicted of a felony commits an offense if he or she possesses a firearm: . . .

after conviction and before the fifth anniversary of the person's release from confinement following conviction of the felony or the person's release from supervision under community supervision, parole, or mandatory supervision, whichever date is later.

TEX. PENAL CODE ANN. § 46.04(a)(1) (West 2011). Here, the State's indictment alleged that Swapsy, "having been convicted of the offense of Violate OP/Other Prior on the 21st day of June, 2012, in cause #12CR-5105 in the Circuit Court of Cook County, Illinois, intentionally and knowingly possess[ed] a firearm before the fifth anniversary of the defendant['s] release from confinement following conviction of the felony." Here, Swapsy argues only that the evidence was insufficient to establish that he knowingly possessed the firearm.

3

### A. The Links Test

"Possession" is defined as "actual care, custody, control, or management." TEX. PENAL CODE ANN. § 1.07(a)(39) (West Supp. 2018). "Possession is a voluntary act if the possessor knowingly obtains or receives the thing possessed or is aware of his control of the thing for a sufficient time to permit him to terminate his control." TEX. PENAL CODE ANN. § 6.01(b) (West 2001). To obtain a conviction for possession of a firearm, the State must show that the accused not only exercised actual care, control, or custody of the firearm, but also that he was conscious of his connection with it and that he possessed it knowingly. *See Brown v. State*, 911 S.W.2d 744, 747 (Tex. Crim. App. 1995); *Smith v. State*, 118 S.W.3d 838, 842 (Tex. App.—Texarkana 2003, no pet.). "[E]vidence which affirmatively links him to it suffices for proof that he possessed it knowingly." *Brown*, 911 S.W.2d at 747. However, these affirmative links must demonstrate that "the accused was aware of the object, knew what it was, and recognized his or her connection to it." *Smith*, 118 S.W.3d at 842 (citing *Gill v. State*, 57 S.W.3d 540, 544 (Tex. App.—Waco 2001, no pet.)).

The evidence showing these links may be direct or circumstantial, but the evidence must establish that the connection between the accused and the firearm is more than fortuitous. *Davis v. State*, 93 S.W.3d 664, 667 (Tex. App.—Texarkana 2002, pet. ref'd). Therefore, the mere presence of the accused at the location where a firearm is found is not sufficient, in and of itself, to establish his knowing possession. *See Evans v. State*, 202 S.W.3d 158, 162 (Tex. Crim. App. 2006). This rule protects the innocent bystander (such as a relative, friend, or even stranger to the actual possessor) from conviction merely due to his fortuitous proximity to a firearm belonging to

4

someone else. *See id*. However, the defendant's presence or proximity to the weapon, combined with other evidence, may be sufficient to establish this element. *Id*.

Certain factors, either alone or in combination, may be considered in deciding whether the evidence is legally sufficient to circumstantially establish an accused's knowing possession of a firearm. *See James v. State*, 264 S.W.3d 215, 219 (Tex. App.—Houston [1st Dist.] 2008, pet. ref'd); *Bates v. State*, 155 S.W.3d 212, 216–17 (Tex. App.—Dallas 2004, no pet.); *Smith*, 118 S.W.3d at 842; *Nguyen v. State*, 54 S.W.3d 49, 53 (Tex. App.—Texarkana 2001, pet. ref'd), *overruled on other grounds by Fagan v. State*, 362 S.W.3d 796 (Tex. App.—Texarkana 2012, pet. ref'd).

> These factors include: (1) the defendant's presence when the search was conducted, (2) whether the firearm was in plain view, (3) whether the defendant was in close proximity to and had access to the firearm, (4) whether the defendant had a special connection to the firearm, (5) whether the defendant possessed other contraband when arrested, (6) whether the defendant made incriminating statements when arrested, (7) whether the defendant attempted to flee, (8) whether the defendant made furtive gestures, (9) whether the defendant owned or had the right to possess the place where the firearm was found, (10) whether the place where the firearm was found was enclosed, (11) whether conflicting statements on relevant matters were given by the persons involved, and (12) whether the defendant's conduct indicated a consciousness of guilt.

*Gordy v. State*, No. 06-18-00057-CR, 2018 WL 447222, at *3 (Tex. App.—Texarkana Sept. 19, 2018, no pet. h.) (mem. op., not designated for publication).

"The absence of various links does not constitute evidence of innocence to be weighed against the links present." *Williams v. State*, 313 S.W.3d 393, 398 (Tex. App.—Houston [1st Dist.] 2009, pet. ref'd). Rather, it is the logical force of the links, rather than the number of links, that is dispositive. *Evans*, 202 S.W.3d at 161–62; *Smith v. State*, 176 S.W.3d 907, 916 (Tex. App.—

5

Dallas 2005, pet. ref'd). Further, the links need not exclude every other reasonable hypothesis but the defendant's guilt. *Brown*, 911 S.W.2d at 748.

### B. The Evidence at Trial

Jim Burkett, a special agent with the Texas Department of Public Safety's Criminal Investigation Division and Organized Crime Division, and David Barnett, a deputy with the Harrison County Sheriff's Office, travelled to Swapsy's home during a random visit designed to ensure that Swapsy was complying with sex-offender registration requirements. Burkett described Swapsy and his girlfriend of nineteen years, Melody Merritt, as compliant and very polite. Burkett testified that Swapsy and Merritt swiftly provided consent to search the home after they both denied having any firearms in the home. Soon thereafter, Barnett found a loaded firearm in a bag containing "a lot of bullets" of two different calibers in the bottom drawer of a nightstand situated on the left side of the bed in the master bedroom. Only Swapsy and Merritt slept in that bedroom.

Burkett testified that the top drawer contained a man's wallet with Swapsy's expired insurance card and public library card, Swapy's pharmacy prescription, and a letter addressed to him, which was postmarked three weeks before the search. Photographs of the scene confirmed the contents of the nightstand, as well as Burkett's testimony that the gun was found in the bottom drawer among hats, baseball caps, toboggans, and "a brim type hat." Burkett classified these items as men's clothing.

According to Burkett, Swapsy denied ownership of the gun or knowledge of its existence in the house. Merritt immediately reported that she had inherited the gun from her father and echoed that Swapsy knew nothing of it. According to Burkett, Swapsy also denied using the

nightstand or having access to it. While Burkett described Swapsy as compliant and polite, he testified, "[Swapsy] was evasive and I didn't find his answers to be consistent with what was found in . . . the drawers, once the firearm was found." Burkett added that although Swapsy did not exhibit any overt signs that he was hiding anything, he did not believe Swapsy's denial of control over the nightstand or his claim that he was unaware of the gun. Therefore, after verifying that Swapsy was a convicted felon and that five years had not yet passed since his release, Burkett arrested Swapsy for unlawful possession of a firearm.

Merritt testified in Swapsy's defense at trial. She told the jury that she had inherited the gun from her father and had never told Swapsy about the weapon. Merritt said that officers had seen a BB gun in plain sight on top of the dresser and that although she had told the police about the BB gun, she lied about having other firearms in the house. When questioned about the contents of the bottom drawer of the nightstand, Merritt admitted that some of the hats belonged to Swapsy, but explained that she had stored them and that Swapsy had "not been in that drawer," even though he wore some of the hats on rare occasions. Merritt further stated that Swapsy kept all of his clothes (including the vast majority of hats worn by him) in "a little den area that we call the man cave."[1] Initially, when asked whether Swapsy had opened the bottom drawer, Merritt replied, "Maybe -- the bottom drawer, no. The top one, yes." She later testified that Swapsy had opened the bottom drawer but opined that he was unaware of the gun because he had never discussed the firearm with her.

---

[1]Burkett testified that there was another bedroom that did not appear to be lived in which contained Swapsy's storage.

7

Merritt was then questioned about the other contents on or in the nightstand. She testified that her electronic tablet, which Swapsy sometimes used, was on top of the nightstand. According to Merritt, the top drawer contained jewelry belonging to both of them, Swapsy's old wallet, and his expired insurance card and library card. Merritt said that she had placed the letter addressed to Swapsy in the nightstand so he could find it easily. She testified, "When I have back problems, I sleep on the side of the bed where they found the gun, which is his side." While she admitted that the nightstand was on Swapsy's side of the bed, Merritt claimed that she had been sleeping on that side at the time the gun was found.

Critically, Merritt testified she had wrapped the gun in a white towel before placing it underneath the hats in the bottom drawer. After Merritt's statement, Barnett was recalled to testify and stated that the gun had not been wrapped in a towel when he discovered it. Barnett explained that he would have noticed a white towel wrapped around the weapon and would have reported it. He further drew the jury's attention to the fact that there were no towels in the photographs taken of the contents of the nightstand.

## C. Analysis

The State need not prove the accused had exclusive possession of the firearm; joint possession is sufficient to sustain a conviction. *Greer v. State*, 436 S.W.3d 1, 5 (Tex. App.—Waco 2014, no pet.). Here, Swapsy points to his denial of any connection with the firearm, Merritt's testimony that he did not know about the gun, and Burkett's testimony that he did not make any furtive gestures, incriminating statements, attempts to flee, or other gestures indicating a consciousness of guilt.

8

However, the firearm was found in the nightstand in Swapsy's bedroom located beside what was normally Swapsy's side of the bed. Merritt testified that the nightstand, including the bottom drawer where the gun was found, contained several items that belonged to Swapsy. Even though Merritt initially testified that Swapsy had not accessed the drawer, there was no evidence indicating that the drawer was locked, and she later conceded that he had opened it. This suggested that Swapsy had access to the firearm.

We find that the evidence established, at a minimum, links 1, 3, and 10 between Swapsy and the gun recovered during the search. More importantly, we find that the logical force of these links, taken together, had a strong tendency to connect Swapsy to the firearm and established that Swapsy's connection with the firearm was more than just fortuitous.

Moreover, Merritt's testimony and Swapsy's denial of possession of the weapon required a resolution of conflicting evidence, as well as an evaluation of witness credibility and the weight to be given to their testimony. These are functions left to the jury's sole discretion. *See Cain v. State*, 958 S.W.2d 404, 408–09 (Tex. Crim. App. 1997). Merritt claimed that she had wrapped the gun in a white towel before concealing it in the bottom drawer of the nightstand, but Barnett testified that there was no towel around the gun when it was found. This discovery placed Merritt's credibility into question and supported a rational inference that the towel could have been removed by Swapsy, since only he and Merritt shared the drawer. Accordingly, the jury was free to reject Merritt's testimony, as well as Swapsy's denial of knowledge of and access to the gun.

9

We find that legally sufficient evidence supported the jury's finding that Swapsy committed the offense of felon in possession of a firearm. We overrule Swapsy's sole point of error.

## II. The Judgment Must Be Modified

The trial court's judgment incorrectly reflects that the conviction was the result of a bench trial and that the sentence was a result of a plea bargain agreement. Yet, the appellate record establishes that Swapsy was convicted by a jury and that his sentence was the not the result of a plea bargain. We have the authority to modify the judgment to make the record speak the truth. TEX. R. APP. P. 43.2; *French v. State*, 830 S.W.2d 607, 609 (Tex. Crim. App. 1992); *Rhoten v. State*, 299 S.W.3d 349, 356 (Tex. App.—Texarkana 2009, no pet.). Accordingly, we modify the trial court's judgment to reflect that Swapsy was convicted by a jury and that there was no plea bargain agreement.

## III. Conclusion

We modify the trial court's judgment (1) to reflect that Swapsy was convicted by a jury and (2) by removing the reference that Swapsy's sentence was the result of a plea bargain agreement. As modified, we affirm the trial court's judgment.

Bailey C. Moseley
Justice

Date Submitted:     October 4, 2018
Date Decided:       October 11, 2018

Publish

10