

# In The
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

No. 06-18-00119-CR

MITCHELL DAMOND MARTIN, Appellant

V.

THE STATE OF TEXAS, Appellee

On Appeal from the 7th District Court
Smith County, Texas
Trial Court No. 007-0047-18

Before Morriss, C.J., Burgess and Stevens, JJ.
Memorandum Opinion by Justice Stevens

MEMORANDUM OPINION

After a Smith County jury found Mitchell Damond Martin guilty of assault on a public servant, he was sentenced to ten years' confinement in prison.[1] In his sole issue on appeal, Martin contends there was insufficient evidence to support the jury's guilty verdict. Because we find there was sufficient evidence to support the verdict, we affirm the trial court's judgment.

## I.    Background

On October 31, 2017, Gregg Roberts, a detective with the Tyler Police Department, was working as a part of the United States Marshals' Joint East Texas Fugitive Task Force.[2] According to Roberts, the task force was attempting to locate Martin in an effort to execute an arrest warrant. The officers had obtained Martin's last known address and his photograph. When they arrived at the address, the officers pulled in behind a white Chevrolet Impala and activated their overhead emergency lights.[3] As the officers approached the vehicle, in the roadway, they noticed Martin sitting in the driver's seat. Martin was instructed to keep his hands visible and to turn off the vehicle. Roberts asked Martin his name, and Martin replied, "Jared Wilkins." Martin also stated that he did not have a driver's license. Yet, Roberts noticed a Texas driver's license on the seat in

---

[1]Originally appealed to the Twelfth Court of Appeals in Tyler, Martin's case was transferred to this Court by the Texas Supreme Court pursuant to its docket equalization efforts. *See* TEX. GOV'T CODE ANN. § 73.001 (West 2013). Because this is a transfer case, we apply the precedent of the Tyler Court of Appeals to the extent it differs from our own. *See* TEX. R. APP. P. 41.3.

[2]Roberts described his work with the task force as "look[ing] for violent fugitives or violent offenders that have felony warrants."

[3]Roberts explained that there were several officers involved and that they were driving separate vehicles.

the vehicle.[4]  At that point, Roberts advised Martin that he was being detained for the offense of driving without a license.

Roberts proceeded to contact the Tyler Police Department, asking that a marked unit be sent to the scene.  When asked why he requested a marked unit, Roberts explained, "Because we're in trucks that don't have visible markings, like badges and police insignia.  I wanted to be certain that [Martin] -- as well as anybody in the neighborhood -- knew that we were conducting a legitimate police action."

Roberts stated that Martin was "sweating profusely.  And it was only 57 degrees outside." Based on his training, Roberts construed Martin's physical appearance as being an indication that he had an elevated stress level.  Despite being asked to exit the vehicle, Martin remained inside the car smoking a cigarette,[5] talking on a speaker phone, and being argumentative with Roberts "from the get-go."

About that time, Charles Barber, a Tyler police officer, arrived at the scene in a marked police car and wearing his police uniform.  After Barber's arrival, Roberts began to remove Martin from the vehicle.[6]  Noting that many neighbors had come outside their homes and that Martin was "wailing and hollering," Roberts explained, "Sometimes people [who are being arrested] act out in exaggerated fashions to engender sympathy or, I guess, support from the people that are around them."  Roberts then conducted a pat-down search of Martin to determine whether he was carrying

---

[4]It was later determined that the license belonged to Martin.

[5]Roberts also instructed Martin not to light a cigarette, but Martin refused to comply with his instructions.

[6]The State offered, and the trial court admitted, the video recordings of Martin's arrest, which had been taken from the officers' body cameras.

weapons or contraband that might cause physical harm to the officers. Although Martin finally revealed his correct last name, he immediately denied having any outstanding warrants against him.

Roberts explained that Barber would be transporting Martin because he was driving a marked police vehicle, with a transport cage in the back. "It's safer for prisoner transportation, particularly when you have people that you're not sure about their level of cooperation." According to Roberts, when Barber began to escort Martin toward the patrol unit, Martin pulled away and began physically resisting Barber.[7] Roberts stated that Martin was struggling against the officers. Roberts continued, "But he's not being pushed as much as -- we're trying to escort him to the car and maintain our physical control over him." Roberts described Martin as dragging his feet, pulling, twisting, and in general, resisting the officers' efforts of placing him into Barber's vehicle. Based on Martin's behavior, Roberts implored, "Please stop pulling." Roberts stated that, because of Martin's erratic behavior, both Martin and Barber fell to the ground, which led to Barber sustaining injuries to his knee and his hand.[8]

Barber testified that, before his arrival at the scene, Roberts had informed him that Martin was not complying with the officers' instructions. Barber explained that, after Martin had been

---

[7]Martin had been placed in handcuffs that were "double locked," which, according to Roberts, meant "they don't ratchet down on [Martin] when he sits on the handcuffs in the cage of the police car. So it's safer and more secure and more comfortable."

[8]According to Roberts, Martin kept struggling with the officers after Martin and Barber fell to the ground by locking his legs "on the edge of the vehicle." Roberts stated, "Because he is actively resisting against us, he ha[d] become tangled in the seat belt, and we're trying to get that worked out and get him into the proper position where he will be comfortable and secure."

4

placed in handcuffs, he searched Martin for weapons, contraband, and illegal substances.[9] Barber said that, when the officers began moving with Martin, he refused to move his feet. Barber testified, "So I'm having to use a little bit of force to push him forward to make him move forward." Barber stated that Martin "was walking on his toes only and digging his toes in and resisting the escort." According to Barber, the only reason Martin was moving was because he was forcing him to move. Barber stated, "But he's not going willingly." Barber explained that, because of Martin's noncompliance with the officers' instructions, Roberts almost tripped over Martin.

Barber then asked Roberts to go to the driver's side door of the patrol vehicle and unlock the door so that when he got Martin to the passenger-side back door, he could get Martin inside "without any problems." Barber stated that he instructed Martin to "[w]alk around to the side of the car[,]" but he refused to walk. Barber continued, "So I had to push him a little bit. So I put a little pressure on him." Barber stated that Martin would not move his feet. Barber described Martin's behavior as "resisting this arrest and detention." Barber stated that, because Martin would not move his feet, their feet got tangled, and Barber tripped over Martin and "went down to the asphalt." Barber said that, when he fell to the asphalt, he felt pain in both of his hands. Barber explained that his hands were "bleeding pretty good." According to Barber, he would not have fallen or sustained any injuries had Martin complied with his instructions.[10] After several more minutes of Martin's continued resistance, the officers successfully placed Martin securely inside

---

[9]Like Roberts, Martin reviewed the recordings of the incident, while explaining to the jury what was taking place.

[10]Barber was asked, "[A]s to [Martin's] resistance, did any of that appear -- did that appear to you to be completely voluntary, active resistance on his part?" Barber responded, "Absolutely. It was intentional on his part. More than just voluntary. He intended to resist, to cause some type of response. The response was that we fell to the ground and caused me injury."

5

the police vehicle. Initially, Martin was charged with resisting arrest, but due to Barber's injuries, the charge was later changed to assault on a public servant.[11]

## II.    Discussion

In his sole point of error, Martin contends that the evidence was legally insufficient to support his conviction of assault on a public servant. In evaluating legal sufficiency, we must review all the evidence in the light most favorable to the verdict to determine whether any rational fact-finder could have found, beyond a reasonable doubt, that Martin was guilty of assault on a public servant. *See Brooks v. State*, 323 S.W.3d 893, 912 (Tex. Crim. App. 2010) (plurality op.) (citing *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)); *Hartsfield v. State*, 305 S.W.3d 859, 863 (Tex. App.—Texarkana 2010, pet. ref'd) (citing *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007)). Our rigorous legal sufficiency review focuses on the quality of the evidence presented. *Brooks*, 323 S.W.3d at 917 (Cochran, J., concurring). We examine legal sufficiency under the direction of the *Brooks* opinion, while deferring to the responsibility of the fact-finder "to fairly resolve conflicts in testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007) (citing *Jackson*, 443 U.S. at 318–19).

Legal sufficiency of the evidence is measured by the elements of the offense as defined by a hypothetically correct jury charge. *Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997). The hypothetically correct jury charge "sets out the law, is authorized by the indictment, does not

---

[11]Martin described a cut to his index finger on his left hand that required four stitches, and another cut along the web between his thumb and index finger. Martin stated that the knuckle of his little finger on his right hand had been "smashed against the asphalt[,]" which he said "caused a great deal of pain."

unnecessarily increase the State's burden of proof or unnecessarily restrict the State's theories of liability, and adequately describes the particular offense for which the defendant was tried." *Id.*

The elements of assault on a public servant are that a person (1) intentionally,[12] knowingly,[13] or recklessly[14] (2) causes bodily injury (3) to a person (4) whom the actor knows to be a public servant, and (5) that public servant is discharging an official duty. TEX. PENAL CODE ANN. § 22.01(a)(1), (b)(1) (West Supp. 2018). "Bodily injury" is defined as "physical pain, illness, or any impairment of physical condition." TEX. PENAL CODE ANN. § 1.07(a)(8) (West Supp. 2018). This "purposefully broad" definition of "bodily injury" includes physical pain from "even relatively minor physical contacts so long as they constitute more than mere offensive touching." *Morales v. State*, 293 S.W.3d 901, 907 (Tex. App.—Texarkana 2009, pet. ref'd) (quoting *Wawrykow v. State*, 866 S.W.2d 87, 89 (Tex. App.—Beaumont 1993, pet. ref'd) (citing *Lane v.*

---

[12]"A person acts intentionally, or with intent, with respect to the nature of his conduct or to a result of his conduct when it is his conscious objective or desire to engage in the conduct or cause the result." TEX. PENAL CODE ANN. § 6.03(a) (West 2011).

[13]Section 6.03(b) states,

> A person acts knowingly, or with knowledge, with respect to the nature of his conduct or to circumstances surrounding his conduct when he is aware of the nature of his conduct or that the circumstances exist. A person acts knowingly, or with knowledge, with respect to a result of his conduct when he is aware that his conduct is reasonably certain to cause the result.

TEX. PENAL CODE ANN. § 6.03(b) (West 2011).

[14]Section 6.03(c) states,

> A person acts recklessly, or is reckless, with respect to circumstances surrounding his conduct or the result of his conduct when he is aware of but consciously disregards a substantial and unjustifiable risk that the circumstances exist or the result will occur. The risk must be of such a nature and degree that its disregard constitutes a gross deviation from the standard of care that an ordinary person would exercise under all the circumstances as viewed from the actor's standpoint.

TEX. PENAL CODE ANN. § 6.03(c) (West 2011).

7

*State*, 763 S.W.2d 785, 786 (Tex. Crim. App. 1989)). A jury may infer intent from any facts which tend to prove its existence, including the defendant's acts, words, and conduct, or the nature of the wounds inflicted on the victim. *Guevara v. State*, 152 S.W.3d 45, 50 (Tex. Crim. App. 2004); *Hart v. State*, 89 S.W.3d 61, 64 (Tex. Crim. App. 2002).[15]

Martin contends that "the injuries sustained by Officer Barber occurred as a result of them tripping over each other" and that "this tripping does not meet the required culpable mental state for the offense."[16] We disagree. Even if Martin did not intend to assault Barber, the State established the indicted offense by proving that Martin acted either knowingly or recklessly. The testimony of Roberts and Barber, along with the patrol car dashboard camera recording, and the officers' body-camera recordings, showed a struggle in which Martin repeatedly flouted the officers' directions. As a result of Martin's intentional failure to comply with the officers' instructions, Martin's legs and feet became entwined with Barber's legs and feet, which directly led to Barber's injuries. The statute defining assault contains no requirement that the defendant exert force against the victim in any particular way to cause the victim's injury. *Morales*, 293 S.W.3d at 908.

The evidence showed that Martin disregarded a substantial, non-justifiable risk that his "struggling" and "flailing" could have resulted in bodily injury to any of the officers involved in effectuating his arrest. *See Gumpert v. State*, 48 S.W.3d 450, 454 (Tex. App.—Texarkana 2001,

---

[15]Further, "[t]he jury, being the judges of the facts and credibility of the witnesses, could choose to believe or not believe the witnesses, or any portion of their testimony." *Sharp v. State*, 707 S.W.2d 611, 614 (Tex. Crim. App. 1986) (citing *Esquivel v. State*, 506 S.W.2d 613, 615 (Tex. Crim. App. 1974)).

[16]Martin does not complain of the sufficiency of the evidence as it relates to the remaining elements of the charged offense.

8

pet. ref'd). In fact, Martin's reckless and belligerent behavior toward Barber caused Barber to fall to the asphalt, which in turn, caused his injuries. *See Lofton v. State*, 45 S.W.3d 649, 652 (Tex. Crim. App. 2001) ("Even if appellant had intended only to prevent his arrest, the force used by appellant against [the officer], at the very least, recklessly caused [the officer] to suffer a bodily injury."). Thus, Martin's actions toward Barber were beyond a "mere offensive touching." *See Morales*, 293 S.W.3d at 907. We therefore conclude that a rational trier of fact could have found beyond a reasonable doubt that Martin assaulted Barber.

Martin's point of error is overruled.

## III.    Conclusion

We affirm the trial court's judgment.


                                        Scott E. Stevens
                                        Justice


Date Submitted:      March 6, 2019
Date Decided:        April 10, 2019

Do Not Publish

9